[Crim. No. 8962. Third Dist. Mar. 2, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCISCO FRANCO MEDRANO et al.,
Defendants and Appellants.

## COUNSEL

Jerome Cohen, Sanford N. Nathan, George C. Lazar, Mary H. Mocine, W. Daniel Boone, E. Michael Heumann and Glen Rothner for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Marjory Winston Parker and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

Harry J. Delizonna, Dennis Sullivan, Ellen Lake and Manuel Medeiros as Amici Curiae.

## OPINION

**FRIEDMAN, J.\***—Opinion on rehearing. Here we deal, first, with a claim that California's Agricultural Labor Relations Act of 1975 (ALRA; Lab. Code, § 1140 et seq.) divested the municipal court of jurisdiction to try two union organizers on a misdemeanor trespass charge and, second, with a claim that the criminal prosecution infringed constitutional freedoms of communication possessed by defendants and by the farm workers they sought to address.

A municipal court jury found defendants guilty of violating Penal Code section 602, subdivision (n),[1] by trespassing upon property leased

---

\*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1]Penal Code section 602 provides: "Every person who willfully commits a trespass by any of the following acts is guilty of a misdemeanor: . . . (n) Refusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public, upon being requested to leave by a peace officer and the owner, his agent, or the person in lawful possession thereof."

to a farm labor contractor. Defendants appealed to the superior court and we ordered the appeal transferred here for decision. (Code Civ. Proc., § 911; Cal. Rules of Court, rule 63.)

The events are described in a settled statement on appeal. The incident occurred at a farm labor camp operated by Alphonso De Dios, a licensed farm labor contractor, on property leased from a third person. On the property were five buildings occupied by farm workers and their families. De Dios lived in a mobile home on the same premises. The property was surrounded by a fence. A gate which was usually unlocked provided entry. Several labor camps operated by other contractors were nearby. De Dios imposed no restriction on entry or exit of workers and visitors but did require solicitors to obtain permission to enter the property.

At the time of the incident, September 13, 1975, De Dios was absent from the camp and had left his son Robert in charge. Robert De Dios worked as a labor supervisor for his father and resided at another of his father's labor camps. In the late afternoon he saw two organizers for the United Farm Workers Union on the premises and asked them to leave. The organizers complied with the request and reported back to defendant Jan Peterson, the area supervisor for the union. Peterson had sent the organizers to De Dios' labor camp after learning earlier that day that a representation election for employees of Vista Verde Farms had been scheduled by the Agricultural Labor Relations Board (ALRB) for the following day. Some of the occupants of De Dios' labor camp worked for Vista Verde Farms.

Upon learning that the organizers had been asked to leave De Dios' camp, Jan Peterson and several other organizers went to the premises, entered without resistance and began knocking on the doors of workers' living quarters to inquire whether they were employees of Vista Verde Farms and whether they needed transportation to the polling sites for the coming election. Within a half-hour of their arrival Robert De Dios confronted them and asked them to leave. When Peterson, the spokesperson, rejected the request, De Dios telephoned the sheriff's department. Sheriff's deputies arrived within 20 minutes and conferred briefly with Peterson, who told them that the organizers were entitled to be on the premises. At about the same time defendant Francisco Medrano entered the labor camp. He too was an organizer for the United Farm Workers. The sheriff's deputies approached the group of organizers with whom Peterson was standing and asked them to leave the premises.

Robert De Dios made a similar request. The other organizers complied but defendant Peterson remained behind and was cited for trespass. Standing some distance away, Medrano watched the group of organizers disperse, after De Dios requested them to leave. As Medrano awaited instructions from Peterson, a deputy sheriff approached him and issued a trespass citation.

Three residents of the camp testified that they had not invited defendants to enter the premises on the day in question and did not consider them to be welcome. At trial both defendants testified that they had entered this particular labor camp without incident on earlier occasions. On the first day Medrano had gone to De Dios' residence to seek permission to enter the camp but had found no one home. Jan Peterson testified that she had been at the De Dios camp on prior occasions and had always received a pleasant reception.

Counsel for the ALRB have filed an amicus curiae brief devoted primarily to the theme that union access to the farm labor camp was arguably protected by the ALRA, hence that the municipal court had no jurisdiction to try the trespass charge. Attorneys for the two defendants emphasize the claimed interference with free speech.

I

The lack-of-jurisdiction argument advanced by amici curiae is premised upon the "preemption doctrine" developed under the National Labor Relations Act (NLRA), 29 United States Code section 151 et seq. According to that doctrine, when labor union activity is arguably among the "concerted activities" extended to labor by the act, federal and state courts generally defer to the exclusive competence of the National Labor Relations Board, the agency delegated by Congress to administer the act. (See generally, *Farmer* v. *Carpenters* (1977) 430 U.S. 290 [51 L.Ed.2d 338, 97 S.Ct. 1056]; *San Diego Bldg. Trades Council* v. *Garmon* (1959) 359 U.S. 236, 245 [3 L.Ed.2d 775, 783, 79 S.Ct. 773]; *Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters* (1976) 17 Cal.3d 893, 896-898 [132 Cal.Rptr. 443, 553 P.2d 603].) ■ The California Agricultural Labor Relations Act was closely modeled after the federal law. Indeed, one provision of the ALRA, Labor Code section 1148, expressly directs the state Agricultural Labor Relations Board to follow the applicable precedents of the National Labor Relations Act.

Like section 7 of the NLRA, section 1152 of the Labor Code enumerates the rights of organization, collective bargaining and concerted activities possessed by employees. Combining the features of section 8 of the NLRA, Labor Code section 1153 enumerates unfair labor practices on the part of agricultural employers and section 1154 the unfair labor practices of labor organizations. Other provisions of the California law (§§ 1156-1159) follow the federal model, directing the ALRB to supervise elections in which agricultural employees may select a union to represent them in collective bargaining. (See *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 398-400 [128 Cal.Rptr. 183, 546 P.2d 687].) Sections 1160 et seq. authorize the ALRB to prevent "any person" from engaging in an "unfair labor practice" as defined by the preceding provisions of the act. The ALRB procedure is the exclusive method of redressing unfair labor practices. (Lab. Code, § 1160.9.)

In designating the NLRA precedents as guideposts, the ALRA apparently incorporates into California law the general features of the preemption doctrine. (*United Farm Workers* v. *Superior Court* (1977) 72 Cal.App.3d 268, 273 [140 Cal.Rptr. 87]; see also, *Nishikawa Farms, Inc.* v. *Mahony* (1977) 66 Cal.App.3d 781 [136 Cal.Rptr. 233].)

■ The enumeration of employee rights under statutes such as the federal NLRB and the California ALRA carries with it a statutory assurance of free communication essential to the realization of those rights; when organizing and choice-of-representative activities transport labor advocates onto the employer's land, the resolution of conflicting rights will be resolved by seeking a "proper accomodation" with the objective of inflicting "as little destruction of one as is consistent with the maintenance of the other;" subject to ultimate review, the labor board has preemptive jurisdiction to establish the accomodation. (*Labor Board* v. *Babcock & Wilcox Co.* (1956) 351 U.S. 105, 112 [100 L.Ed. 975, 982-983, 76 S.Ct. 679]; *Hudgens* v. *NLRB* (1976) 424 U.S. 507, 522 [47 L.Ed.2d 196, 208, 96 S.Ct. 1029]; *Central Hardware Co.* v. *NLRB* (1972) 407 U.S. 539, 544 [33 L.Ed.2d 122, 127, 92 S.Ct. 2238]; *Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters, supra,* 17 Cal.3d at pp. 897-898; *Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d at pp. 404-409.)

The statutory assurance includes a ticket of limited admission to nonemployee union organizers; an employer may bar organizers from his property if other channels of communication are open to them; if the

location of the plant and the living quarters of the employees place the latter beyond reach, the employer must allow the union to approach the employees on his property. (*Labor Board* v. *Babcock & Wilcox Co., supra,* 351 U.S. at p. 113 [100 L.Ed. at p. 983]; *Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d at pp. 409-411.) Labor organizing activity may elicit the labor legislation's communicative protections even if the activity might otherwise be a trespass on the employer's private property. (*Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters, supra,* 17 Cal.3d at p. 899; *Musician's Union, Local No. 6* v. *Superior Court* (1968) 69 Cal.2d 695, 711 [73 Cal.Rptr. 201, 447 P.2d 313].)

An ongoing problem under the NLRA is whether the preemption doctrine ousts the courts of power to entertain civil or criminal trespass charges against union representatives who conduct activities on employers' property. Amici curiae strongly rely on *Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters, supra,* 17 Cal.3d 893. There the court nullified an injunction against union picketing on the employer's private property. Despite the trespassory nature of the conduct, it was arguably among the concerted activities of labor protected against employer interference; hence it fell initially within the exclusive competence of the NLRB and displaced the jurisdiction of the state courts. (17 Cal.3d at p. 899.)

Out-of-state decisions have considered the preemption defense in criminal trespass prosecutions against union pickets. Two courts have rejected the defense. (*People* v. *Goduto* (1961) 21 Ill.2d 605 [174 N.E.2d 385] cert. den., 368 U.S. 927 [7 L.Ed.2d 190, 82 S.Ct. 361]; *People* v. *Bush* (1976) 39 N.Y.2d 529 [384 N.Y.S.2d 733, 349 N.E.2d 832].) Two others have accepted it. (*Commonwealth* v. *Noffke* (Mass.App. 1977) [364 N.E.2d 1274]; *State of Maryland* v. *Williams* (Balt.Crim.Ct., Md., 1959) 44 L.R.R.M. 2357, 2363.) The California Supreme Court has expressed its disapproval of the former view, its approval of the latter. (*Sears, Roebuck & Co.* v. *San Diego Dist. Council of Carpenters, supra,* 17 Cal.3d at p. 906, fn. 8; *Musician's Union Local No. 6* v. *Superior Court, supra,* 69 Cal.2d at p. 712, fn. 8.)

## II

We have concluded, nevertheless, that the ALRA did not vest the board with preemptive jurisdiction. ▮▮▮ The *Sears* decision involved a trespass on the employer's property. Here the trespass occurred on the

property of a third person, a farm labor contractor. In Labor Code section 1140.4, subdivision (c), the California law distinctly excludes farm labor contractors—such as De Dios—from the statutory category of agricultural employers.[2] The federal law contains no comparable exclusion.

The settled statement on appeal declares that the events occurred at a labor camp housing agricultural workers "employed by [De Dios], a licensed labor contractor."

The exclusion of farm labor contractors from ALRA coverage as agricultural employers reflects a deliberate legislative choice. The creation of stable collective bargaining relationships in agriculture is hindered by shifting employment and fluidity of the work force. To class farm labor contractors, along with farmers and farmer associations, as parties to collective bargaining would augment the difficulties. In the process of creating a collective bargaining relationship—from the initial organizing efforts, into the petition and election stages and ultimately to the contractual culmination—the statute views farmers or associations of farmers as the only employers (see §§ 1156-1159). A farm labor contractor may actually hire, supervise and pay the workers, becoming their actual employer (see, § 1682, subd. (b), fn. 2, *ante*). The ALRA excludes him from the statutory category of agricultural employers because he is excluded from the unionization and collective bargaining processes.

---

[2]Labor Code section 1140.4 provides: "As used in this part . . . (c) The term 'agricultural employer' shall be liberally construed to include any person acting directly or indirectly in the interest of an employer in relation to an agricultural employee, any individual grower, corporate grower, cooperative grower, harvesting association, hiring association, land management group, any association of persons or cooperatives engaged in agriculture, and shall include any person who owns or leases or manages land used for agricultural purposes, *but shall exclude any person supplying agricultural workers to an employer, any farm labor contractor as defined by Section 1682,* and any person functioning in the capacity of a labor contractor. *The employer engaging such labor contractor or person shall be deemed the employer for all purposes under this part.*" (Italics supplied.)

Labor Code section 1682, subdivision (b), part of an enactment requiring the licensing of farm labor contractors, supplies the following definition: " 'Farm labor contractor' designates any person who, for a fee, employs workers to render personal services in connection with the production of any farm products to, for, or under the direction of a third person, or who recruits, solicits, supplies, or hires workers on behalf of an employer engaged in the growing or producing of farm products, and who, for a fee, provides in connection therewith one or more of the following services: furnishes board, lodging, or transportation for such workers; supervises, times, checks, counts, weighs, or otherwise directs or measures their work; or disburses wage payments to such persons."

Section 1153 declares that "[i]t shall be an unfair labor practice for an agricultural employer" to engage in described labor practices. Interference with the organizational rights of agricultural employees and interference with the formation or administration of a labor organization are among the prohibited practices. Excluded by definition from the category of agricultural employers, De Dios—in his role as a farm labor contractor—was definitionally incapable of an unfair labor practice.

■ Section 1140.4, subdivision (c) (fn. 2, *ante*), expands the definition of "agricultural employer" to embrace any person acting on behalf of an employer. Section 1160 authorizes the ALRB to prevent "any person" from engaging in an unfair labor practice. Section 1160.2 et seq. authorizes the board to investigate charges that "any person" has engaged in an unfair labor practice. Under comparable NLRA provisions, a person acting as an employer's agent may be guilty of an unfair labor practice. (See e.g., *National Labor Relations Board* v. *Taylor-Colquitt* (4th Cir. 1943) 140 F.2d 92.)[3] In measuring the reach of the California law, these factors must be juxtaposed to California's exclusion of farm labor contractors. Conceivably, a farm labor contractor may act under specific instructions from the farm operator, transcending his role as a labor contractor and, as the farm operator's special emissary, indulge in an unfair labor practice. Here, the settled statement reveals no evidence that De Dios dealt with union organizers under instructions from Vista Verde Farms or as the latter's agent. Limited to his defined role as a farm labor contractor, De Dios was definitionally incapable of an unfair labor practice.

■ Amici curiae refer us to an ALRB administrative decision, holding an agricultural employer guilty of an unfair labor practice consisting of the action of a farm labor contractor at the latter's own camp without any instruction or participation by the employer. (*Whitney Farms*, 3 A.L.R.B. No. 68 (1977).) The board's holding categorizes the farm labor contractor as a "supervisor" and utilizes section 1140.4, subdivision (j), which defines a supervisor as one who has the authority to hire and discharge "in the interest of the employer."

---

[3]Section 2 of the NLRA (29 U.S.C. § 152(2)) defines "employer" to include "any person acting as an agent of an employer, directly or indirectly." The NLRB has held that a statutory "employer" may be guilty of an unfair labor practice toward employees other than his own. (*Austin Co.* (1952) 101 N.L.R.B. 1257, 1258-1259; see *Hudgens* v. *NLRB* (1976) 424 U.S. 507, 510, fn. 3 [47 L.Ed.2d 196, 201, 96 S.Ct. 1029].) No decision has been brought to our attention upholding NLRB jurisdiction over a person other than a labor union, a statutory employer or one acting under the employer's direction.

The California legislature did not exclude farm labor contractors from the law in the belief that the ALRB could reinsert them by labeling them as "supervisors." Adherence to legislative design prompts us to reject the board's invitation to follow its *Whitney* decision.

In the present case, the union organizers' exclusion from the farm labor camp was the action of a party excluded from the definition of agricultural employer and not acting on behalf of an agricultural employer. Thus, the exclusion was not an unfair labor practice as defined by section 1153.

■ This conclusion does not rest upon statutory verbiage alone. It is necessary to know that finite words yield a result consistent with statutory design. The interest in uniform application of the ALRA tends to support the preemption of state laws which might conflict with its broad objectives. (Cf. *Farmer* v. *Carpenters, supra,* 430 U.S. 290.) We have observed that the enumeration of employees' rights in Labor Code section 1152 carries with it a statutory assurance of free communication essential to the realization of these rights; that this assurance extends to union organizers when alternate, effective channels are not available; that the latter are accorded intrusion on employer's property "limited to that necessary to facilitate the exercise of the employees' [self-organization] rights." (*Central Hardware Co.* v. *NLRB, supra,* 407 U.S. at p. 545 [33 L.Ed.2d at p. 127]; *Labor Board* v. *Babcock & Wilcox Co., supra,* 351 U.S. at p. 112 [100 L.Ed. at p. 982]. Acting upon these principles, the ALRB has adopted a regulation assuring union representatives access to employees on the property of agricultural employers. (Cal. Admin. Code, tit. 8, §§ 20900-20901.) The California Supreme Court has sustained the constitutionality of this regulation as well as its propriety as an exercise of the board's rule-making authority. (*Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392.) Thus, the ALRB's lack of jurisdiction to assure union access to the property of farm labor contractors does not impair the symmetry or frustrate the aims of the ALRA.

■ Here the trespass occurred on the property of a nonemployer. The law's exclusion of the farm labor contractor from the category of agricultural employers demonstrates that events on his land are not a significant concern of the ALRA.

## III

 Defendants assert constitutional as well as statutory protection for their entry. They contend that application of the trespass law closed a constitutionally protected avenue of communication between themselves and the workers living in the farm labor camp. In the absence of ALRA coverage of the labor contractor's enterprise, defendants' constitutional claim represents the pivotal issue in trial and on appeal. The issue is whether the generally valid trespass statute may be constitutionally applied in the circumstances to bar defendants from addressing their message to the camp inhabitants.

At defendants' municipal court trial, the court denied a defense motion for a directed verdict of acquittal and, over a defense objection, instructed the jury in the following terms: "Persons may enter upon private property without committing a trespass if (1) they otherwise conduct themselves lawfully; and (2) the private property has assumed to a significant degree the functional attributes of private property devoted to public use; and (3) the purpose in entering such private property is to [disseminate] thoughts or ideas relating to the property; and (4) there is no reasonable alternative means available by which the thoughts and ideas can be communicated to the persons on the property."

 Where, as here, the verdict of a criminal jury is drawn from undisputed evidence and incorporates criteria which are decisive of constitutional rights, those criteria form issues for adjudication by the reviewing court. (*Drope* v. *Missouri* (1975) 420 U.S. 162, 174-175, esp. fn. 10 [43 L.Ed.2d 103, 114-115, 95 S.Ct. 896].) Even when the resolution of constitutional rights turns on a factual dispute, the appellate court is duty bound to make an independent analysis of the record. (*Codispoti* v. *Pennsylvania* (1974) 418 U.S. 506, 517, fn. 6 [41 L.Ed.2d 912, 922, 94 S.Ct. 2687]; see also, *Bachellar* v. *Maryland* (1970) 397 U.S. 564, 566 [25 L.Ed.2d 570, 573, 90 S.Ct. 1312].)

 Freedom of communication encompasses the right to receive as well as disseminate ideas. (*Kleindienst* v. *Mandel* (1972) 408 U.S. 753, 762-763 [33 L.Ed.2d 683, 691-692, 92 S.Ct. 2576].) Thus, in *Thomas* v. *Collins* (1945) 323 U.S. 516 [89 L.Ed. 430, 65 S.Ct. 315], the court held that a labor organizer's right to speak and the right of workers "to hear what he had to say" (*id.,* at p. 534 [89 L.Ed. at p. 442]), were both abridged by a restrictive state law.

■■■ The federal and California Supreme Courts have confronted a variety of free speech demands by outsiders seeking physical access to audiences within privately owned enclaves. In some cases entry was claimed by exponents of religious and political ideas,[4] in others by union organizers and pickets.[5] Barriers to entry were asserted by an owner of a company town,[6] by owners of shopping centers,[7] parking lots and privately owned sidewalks surrounding business establishments,[8] a railroad station,[9] farms,[10] and farm labor camps.[11]

An intermediate appellate court is rash when it attempts to locate *terra firma* among these decisions, for they are featured by dissents and special concurrences, by temporary majorities and minorities, refined distinctions of fact, judicial disagreements over verbalisms of the past[12] and by the semi-concealed thrust of competing social views. Nevertheless, appraisal of defendants' free speech claim compels a formulation.

We draw the following four-part formula from the cited decisions: (a) The courts will attempt an "accomodation" or "balance" between free speech rights and the property rights of the landowner.[13] (b) The owner's exclusionary assertions receive less weight when the private property

[4]*Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276]; *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219]; *Diamond* v. *Bland* (1974) 11 Cal.3d 331 [113 Cal.Rptr. 468, 521 P.2d 460]; *Diamond* v. *Bland* (1970) 3 Cal.3d 653 [91 Cal.Rptr. 501, 477 P.2d 733]; *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353].

[5]*Food Employees* v. *Logan Plaza* (1968) 391 U.S. 308 [20 L.Ed.2d 603, 88 S.Ct. 1601]; *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561]; *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921]; see also, *Hudgens* v. *NLRB, supra,* 424 U.S. 507.

[6]*Marsh* v. *Alabama, supra,* 326 U.S. 501; see also, *Illinois Migrant Council* v. *Campbell Soup Co.* (1977) 438 F.Supp. 222; *Mid-Hudson Legal Services, Inc.* v. *G. & U. Inc.* (1977) 437 F.Supp. 60.

[7]*Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551; *Food Employees* v. *Logan Plaza, supra,* 391 U.S. 308; *Diamond* v. *Bland, supra* (1974); *Diamond* v. *Bland, supra* (1970); *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union, supra,* 61 Cal.2d 766.

[8]*In re Lane, supra,* 71 Cal.2d 872; see also *Central Hardware Co.* v. *NLRB* (1972) 407 U.S. 539 [33 L.Ed.2d 122, 92 S.Ct. 2238].

[9]*In re Hoffman, supra,* 67 Cal.2d 845.

[10]*Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392.

[11]*United Farm Workers of America* v. *Superior Court* (1975) 14 Cal.3d 902 [122 Cal.Rptr. 877, 537 P.2d 1237].

[12]See e.g., *Hudgens* v. *NLRB, supra,* concurring opinion of Powell, J., 424 U.S. at pages 523-524 [47 L.Ed.2d at page 209].

[13]*Lloyd Corp.* v. *Tanner, supra,* 407 U.S. at pages 567-570 [33 L.Ed.2d at pages 141-143]; *Diamond* v. *Bland, supra,* 11 Cal.3d at page 334.

"assumes to some significant degree the functional attributes of public property devoted to a public use."[14] (c) The free speech claim receives greater weight when the entrant and the owner-invited audience share a relationship engendering a common interest in the message.[15] (d) The free speech claim receives less weight when the entrant can reach the audience through adequate, alternative channels of communication.[16]

Defendants' visit to the De Dios' labor camp was characterized by factors soon to be superseded. Effective August 29, 1975, the ALRB had adopted its regulation granting farm labor organizers a qualified right of access to the property of agricultural employers. (Cal. Admin. Code, tit. 8, §§ 20900-20901.) The regulation was designed to assure union organizers a right to address workers at prescribed times and places on the agricultural employer's property. Defendants were arrested on September 13, 1975. Several days earlier, a peremptory writ of mandate issued by the Superior Court of Fresno County and a temporary restraining order by the Visalia Superior Court had enjoined the ALRB from enforcing the access regulation. (We take judicial notice of these court activities. Evid. Code, § 452, subds. (c) and (d).) These judicial restraints held sway at the time of the September 13 events. Although the ALRB regulation was later sustained by the California Supreme Court

[14]The criterion "functional attributes of public property devoted to a public use" was adopted in *Central Hardware Co.* v. *NLRB, supra,* 407 U.S. 539, decided June 22, 1972. On the same day, the court filed its decision in *Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551. There the court virtually repudiated the phrase "functional equivalent of [a] business district" as a ticket of admission to private property. (407 U.S. at pp. 565-566, 569 [33 L.Ed.2d at pp. 140-141, 143].) Both these vague legalisms are less significant than the fact that the landowner has for his own profit invited an audience onto his property, thus partially insulating them from constitutionally protected messages. The majority opinion in *Tanner* implicitly recognizes the cardinal factor of the audience's presence, for it emphasizes the significance of a relationship between the purpose of the First Amendment activity and the "purpose for which the [landowner's] center was built and being used." (407 U.S. at p. 564 [33 L.Ed.2d at p. 140].) The purpose of the communicative activity is, in turn, a product of the speaker, audience and content of the message.

[15]Here, too, we rely upon the *Tanner* opinion's discerned need for a relationship between the purpose of the communicative activity and the property's designed use (i.e., by the potential audience whom the landowner has invited). The content of the message thus becomes a factor. The element of a shared interest between would-be speaker and audience is emphasized in the labor dispute cases. A number of the cited decisions voice a special concern for the communicative channels between labor unions and audiences within the enclave. (See, e.g., *Hudgens* v. *NLRB,* concurring opinion of White, J., 424 U.S. at p. 524 [47 L.Ed.2d at p. 209]; *Lloyd Corp* v. *Tanner, supra,* 407 U.S. at p. 563 [33 L.Ed.2d at pp. 139-140]; *United Farm Workers* v. *Superior Court, supra,* 14 Cal.3d at p. 910; *Diamond* v. *Bland, supra,* 11 Cal.3d at p. 334, fn. 3.)

[16]*Lloyd Corp.* v. *Tanner, supra,* 407 U.S. at page 567 [33 L.Ed.2d at pages 141-142]; *Diamond* v. *Bland, supra,* 11 Cal.3d at page 335.

(*Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392), it supplied defendant union organizers no effective, alternative means of access at the time of their arrest.

According to the settled statement on appeal, Jan Peterson testified that the ALRB had notified her on September 13 (a Saturday) of the Vista Verde Farms election to be held the next day (Sunday). It is undisputed that the camp inhabitants included employees of Vista Verde Farms. The settled statement on appeal reveals no evidence that between the times of the election notice and the election itself Peterson and Medrano had any means of reaching Vista Verde Farm workers except by entering farm labor camps where the workers lodged.

We discern no need for broad constitutional declarations anent outsiders' access to the inhabitants of farm labor camps. (See *United Farm Workers* v. *Superior Court, supra,* 14 Cal.3d at p. 910 and cases cited; du Fresne & McDonnell, *The Migrant Labor Camps: Enclaves of Isolation in Our Midst* (1971) 40 Fordham L.Rev. 279, 287; Sherman & Levy, *Free Access to Migrant Labor Camps* (1971) 57 A.B.A.J. 434.) Confronting the idiosyncratic facts of this case and guided by the stated principles, a court may reach only one fair accomodation of the conflicting interests. The operator of the farm labor camp had invited farm workers as tenants of the property. Because these tenants had an interest in maintaining human relationships and communication with the world outside the camp, the camp operator had opened the camps to limited entry by social and business visitors of the tenants. It is not necessary to define the perimeters of the opening. It is sufficient to say that the tenants' economic interests were intertwined with the collective bargaining choices confronting them the following day; that they thus formed an audience for information concerning these choices.[17] As a candidate for selection as collective bargaining representative, the union shared with the tenants an interest in the exchange of information concerning the election.[18] In view of the narrow time span between notice of the election and the election, subordination of the private property interest was brief and minimal. (See *In re Zerbe* (1964) 60

[17]Three residents of the camp testified that the union organizers were not welcome to them. We do not know whether these were hand-picked or representative witnesses. Despite their assertions, the effect of the next day's election on Vista Verde Farms' employees and upon their interests is unquestioned.

[18]Although the "interest" was a statutory one having its source in the ALRA (*Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d at p. 402), the shared interest of union and workers is a weight in the balancing of constitutional claims.

Cal.2d 666, 670 [36 Cal.Rptr. 286, 388 P.2d 182, 10 A.L.R.3d 840].) There is no evidence of any effective, alternative channel of communication. Under these circumstances, the free speech interest outweighed the property interest. The trespass law could not be constitutionally applied.

 The jury instruction, moreover, was palpably erroneous. Confronted by a case involving unusual constitutional problems, a trial judge may be hard-pressed for adequate jury instructions. His difficulty is augmented when he is confronted with the self-interested instructions proposed by counsel. The instruction quoted earlier consisted of extracts culled from the majority opinions in *Hudgens* v. *NLRB, supra,* 424 U.S. 507, and *Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551. It is unnecessary to analyze it fully. As a condition of the free speech defense, it demanded that the purpose of defendants' entry be the dissemination of "thoughts or ideas relating to [the labor camp] property." As we view the instruction, it stimulated thought of the physical property rather than the people on it. As we view the *Lloyd Corp.* v. *Tanner* standard (see fn. 14, *ante*), the communication is eligible for constitutional protection when its purpose is related to the purpose for which the prospective audience has been invited onto the land. The phrase in question virtually withdrew one of the principal defenses from the jury's consideration. We have concluded that the trespass law could not constitutionally apply under the circumstances; hence we need not consider whether the erroneous instruction caused a miscarriage of justice.

IV

 Medrano points to a lack of evidence that any of the peace officers requested him to leave. Deputy Sheriff Wells testified that he requested Jan Peterson to leave the farm labor camp and cited her after she refused; he had a conversation with Medrano, but did not testify that he requested Medrano to leave; he testified that Deputy Sheriff Evans talked with several persons on the scene and that Evans issued a citation to Medrano. Deputy Evans was not called as a witness. In his own defense, Medrano testified that after several of the organizers left the property, he remained to await instructions from Jan Peterson; that Deputy Evans came up to him, asked his name and address and issued a citation. He testified that none of the officers asked him to leave the property.

As Penal Code section 602, subdivision (n), is drawn, refusal to leave private property is the gist of the offense. Indispensable preconditions of

that refusal are dual requests to leave, one from a peace officer, the other from the property possessor. The demand for two separate requests is the apparent product of legislative design. "Refusal to leave" is one of a variety of trespasses described by section 602. The other varieties involve some guilty foreknowledge, such as malicious mischief, disregard of posted warnings or unlawful occupancy. Subdivision (n) envisions an originally innocent entry, followed by an unlawful sojourn after refusal of requests to leave. The requirement of two requests impels the property possessor to summon the authorities; it discourages violent confrontations which might occur in the absence of a peace officer. The duality of requests is thus an essential element of the offense.

The settled statement on appeal includes no evidence from which the jury could reasonably infer that Wells, Evans or any other peace officer requested Medrano to leave. The absence of substantial evidence of an essential element of the offense supplies an additional, independent ground for reversal of Medrano's conviction.

The judgments of conviction are reversed with the instruction to dismiss the complaint.

PUGLIA, P. J.—I concur in the result and in the reasoning upon which it is based. However, I wish to disassociate myself from any implication in the court's opinion that there may be circumstances in which the provisions of the ALRA preempt the penal statutes of this state, specifically the criminal trespass laws. In the face of the ALRB's claim to exclusive jurisdiction over this controversy, it is enough to point out, as we do, that farm labor contractors are not agricultural employers and are therefore excluded from the scope of the ALRA. The observation that "the ALRA apparently incorporates into California law the general features of the preemption doctrine" (majority opn., *ante*, p. 205) is gratuitous, unnecessary, and of questionable validity.

PARAS, J.—I concur in the result and in that portion of the lead author's reasoning which finds the trespass statute unconstitutional as narrowly applied to the facts of this case. Additionally I concur in the

reversal of defendant Medrano's conviction for insufficiency of evidence. However I emphatically disavow so much of the opinion's reasoning as treats of the "preemption doctrine" as if it were a viable issue in the case. The litigants and the amici curiae, along with the author, have all inadvertently fallen into the error of assuming the doctrine to be at least rationally arguable. It is not, being wholly foreign to the true legal issues in this case.

Preemption, as applied in the NLRA field, is rooted in the "supremacy clause" of the federal Constitution. It simply reiterates the fundamental principle that where the Congress has acted in a given area, within its constitutional purview (as for example under the commerce power), such congressional action is supreme over legislation of the states in the same area. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 401 et seq., p. 2660 et seq.) The analogue of the federal principle exists between a state and its political subdivisions, such as counties and cities. Where state legislation has "occupied the field," local ordinances or regulations purporting to contravene, or inconsistent with, such legislation are invalid. (5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 445 et seq., p. 3743 et seq.); stated otherwise, where a matter is of general or statewide concern, the Legislature has paramount authority. (*Id.*, § 452 et seq., p. 3749 et seq.) Thus a *sine qua non* of preemption is the existence of two governmental entities, one of which is subordinate to the other in its lawmaking function. In the absence of two such bodies politic, preemption has no greater relevance than the rule-in *Shelley*'s case.

Once we recall this touchstone of preemption, we forthwith note that the doctrine is utterly meaningless here. The ALRA is a California statutory enactment of general and statewide application, as is the trespass law (Pen. Code, § 602). The two share equal stature and neither merits any greater or less dignity vis-à-vis the other. It is senseless to assert that either has "occupied the field" so as to preempt the other.

There is a second conceptual defect in the asserted applicability of federal preemption principles to this case, or to any other like it. The NLRA is a federal civil enactment, while Penal Code section 602 is a criminal statute. Considering the basis of preemption, it is incongruous to claim that federal legislation occupied the field of a state's penal

statutes. Carried to its logical extreme, this would mean that if a picketer is shot by an employer's agent during peaceful and otherwise lawful picketing, the agent may not be prosecuted for aggravated assault under state penal laws because his act was an unfair labor practice. This is, of course, absurd.

Unfortunately this aspect of preemption has not been discussed in any case I have read. Indeed, in all the federal Supreme Court opinions involving preemption only civil action of the state was involved. (See cases noted in 18A Kheel, Business Organizations (1973) §§ 9.03, 9.04.) The only cases dealing with federal preemption and involving criminal prosecutions were *Commonwealth* v. *Noffke* (Mass.App. 1977) [364 N.E.2d 1274], *People* v. *Bush* (1976) 39 N.Y.2d 529 [384 N.Y.S.2d 733, 349 N.E.2d 832], *People* v. *Goduto* (1961) 21 Ill.2d 605 [174 N.E.2d 385], and *State of Maryland* v. *Williams* (Md. 1959) 44 L.R.R.M. 2357. *Noffke* and *Williams* held that NLRA preemption applied, *Goduto* and *Bush* that it did not. But none of them addressed the conceptual difficulty of applying preemption where its effect is that federal civil legislation emasculates a state's penal laws. Nor did they consider that this has neither been done nor has been discussed with approval in any federal case.

I have concluded that preemption was never intended to go this far. My conclusion is bolstered by the repeated reservation to the states of their right to control and prevent violence in labor disputes. (See 18A Kheel, Business Organizations, *supra,* § 9.04.) In addition, I quote the following language of Justice Douglas, concurred in by Justices Warren and Black, dissenting in *Auto Workers* v. *Wisconsin Board* (1956) 351 U.S. 266, at page 276 [100 L.Ed. 1162, at page 1173, 76 S.Ct. 794]: "Of course the States may control violence. *They may make arrests and invoke their criminal law to the hilt.* They transgress only when they allow their administrative agencies or their courts to enjoin the conduct that Congress has authorized the federal agency to enjoin." (Italics added.)

This is not to say that the enactment of civil legislation such as the NLRA or ALRA may not under certain circumstances have an effect upon local penal statutes. On the contrary, such a civil enactment may create a "privilege," which furnishes a defense to a criminal prosecution. Or, there may be constitutional rights which the civil legislation seeks to further and promote, and which, as here, render the penal statute unconstitutional in its specific application to a given case. As between a

civil and a penal statute of the same political entity, inconsistent language may give rise to statutory construction questions, including the rule that the specific prevails over the general. Indeed, civil legislation can have an effect upon penal statutes. But it cannot "preempt" them.

A petition for a rehearing was denied March 20, 1978.