Keith JAMES, et al., Plaintiffs,

v.

**CITY OF LONG BEACH,
et al., Defendants.**

No. CV 97–2155 DDP (CWx).

United States District Court,
C.D. California.

Sept. 8, 1998.

---

Rhonda Kay Walker, Matthew S. Gibbs, Gibbs & Walker, South Pasadena, CA, for plaintiffs.

John Rains Calhoun, Thomas M. Reeves, Long Beach City Atty., Long Beach, CA, Thomas G. Oesterreich, Charles A. Lynberg, Lynberg & Watkins, Los Angeles, CA, for defendants.

## ORDER

## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PREGERSON, District Judge.

This matter comes before the Court on the motion of defendant City of Long Beach (the "City") for summary judgment. The City contends that the plaintiffs have failed to raise a triable issue of fact as to the existence of a constitutional violation in their ejection from a minor league baseball game at Blair Field, a public park in Long Beach.

## I. BACKGROUND

### A. *Factual Background*

Plaintiff Christopher Gibbs ("Gibbs") is the former owner of the Long Beach franchise of the Western Baseball League. (Gibbs Decl. ¶ 3.) During Gibbs's ownership, which ended in 1995, the franchise was known as the Barracuda. (Def.'s Req. for Judicial Notice ("DJRN") Ex. 1.) The Barracuda played in Blair Field, under a permit issued by the City. (*Id.*) In August 1995, the City revoked Gibbs's permit.

In 1996, the City issued a permit to Western League, Inc. ("Western League") and P & P Sports Enterprises, Inc. ("P & P")[1] to allow their minor league franchise, the Long Beach Riptide, to play at Blair Field. (Def.'s UF ¶ 2.)

Paula Pyers is part owner and the general manager of P & P. (Pyers Decl. ¶ 2.) Patrick Elster is part owner and president of P & P.[2] (Elster Decl. ¶ 2.)

While negotiating with the City over the Riptide lease of Blair Field, Pyers and Elster sought to include a term in the lease "acknowledging P & P Sports Enterprises' right to refuse service to any person" and more particularly the team's right to exclude Gibbs due to the continuing dispute between Gibbs and new franchisees. (Elster Decl. ¶¶ 4, 5; Pyers Decl. ¶¶ 4, 5.) On January 31, 1996, Pyers and Elster received a letter from a City official which "specifically did not acknowledge nor permit P & P Sports Enterprises ... the right to refuse service to any person." (Elster Decl. ¶ 6; Pyers Decl. ¶ 6.)

As negotiations continued over the lease, Pyers and Elster continued to press the City for authority to exclude Gibbs from Riptide games at Blair Field. (Elster Decl. ¶¶ 8, 9; Pyers Decl. ¶¶ 8, 9.)

The plaintiffs have alleged that Pyers and Elster never received authority from the City to exclude Gibbs from the games. (FAC at 5:1–3, 5:24–26) ("Defendant City of Long Beach had previously denied the other Defendants the legal authority to prevent Plaintiff Christopher Gibbs from attending any minor league baseball games at Blair Field."). Gibbs stated in his declaration that the City denied the request for a policy excluding him from the Riptide games; Gibbs made the same statement in his administrative claim against the City. (*See* Gibbs Decl. ¶ 11:1; DRJN Ex. 1)

On August 7, 1996, Gibbs, along with plaintiffs Paul Lisenby ("Lisenby") and Keith James ("James"), purchased tickets and attended a Riptide game at Blair Field.

---

1. Western League and P & P were originally defendants in this action. The plaintiffs voluntarily dismissed the complaint as to these defendants. (Stipulation filed May 26, 1998.)

2. Pyers and Elster were originally defendants in this action. The plaintiffs voluntarily dismissed them on May 26, 1998. The only remaining defendant in this action is the City.

(Def.'s UF ¶ 1.) Gibbs, Lisenby and James did nothing to create a disturbance at the game. (Pyers Decl. ¶ 16; Elster Decl. ¶ 18.)

Elster was informed that Gibbs was in the stands. (Elster Decl. ¶ 18.) A call was placed to the Long Beach Police Department. (Pyers Decl. ¶ 17; Elster Decl. ¶ 19.) When the officers arrived, Pyers requested that they remove Gibbs from Blair Field. (Pyers Decl. ¶ 18.)

A private security officer directed Long Beach Police Sergeant Eric Jacobson to Gibbs in the stands. (Jacobson Decl. ¶ 6; *see also* Notice of Lodging of Video Tape Exhibit (videotape with no audio track of Gibbs/Jacobson encounter shot by plaintiff James).) Sergeant Jacobson spoke to Gibbs and asked if he would leave the stadium. (*Id.* ¶ 7.) Sergeant Jacobson told Gibbs that if he did not leave, he would be arrested.[3] (*Id.* ¶ 8; Gibbs Decl. ¶ 9.)

Gibbs and James testify that they felt they had to leave the game or face a night in jail. (Gibbs Decl. ¶ ; James Decl. ¶¶ 8, 9.) They left, escorted by Sergeant Jacobson. (Jacobson Decl. ¶ 9.)

Pyers gave money to his chief of security, Jim Estes, with instructions to give the money to the plaintiffs as a refund of their ticket price. (Pyers Decl. ¶ 19.) Sergeant Jacobson declares that Estes gave Gibbs a refund. (Jacobson Decl. ¶ 9.)

### B. *Procedural Background*

The plaintiffs filed this action on April 2, 1997. The City moved to dismiss on April 23, 1997. In lieu of opposition, the plaintiffs filed a first amended complaint ("FAC") on June 6, 1997. The FAC abandoned the claims against the Long Beach Police Department[4] and defendant Bruce Engel.[5]

The FAC alleges the following claims:

(1) *Deprivation of the First Amendment right to free speech and freedom of association.* The FAC alleges that the City "through its agents" deprived the plaintiffs of their First Amendment rights by "the taking of Plaintiffs into custody and through the use of physical and verbal coercion, including but not limited to the stated threat of arrest even though Plaintiffs had not acted in contravention or violation of any law of the City of Long Beach or the State of California." (FAC at 4:18–5:3.)

(2) *Deprivation of the Fourth Amendment right to be free from unreasonable seizure.* Although the FAC does not specifically mention the Fourth Amendment, the FAC alleges that the plaintiffs were taken into custody despite the arresting officer's knowledge that they had not violated any law. (FAC at 4:24–27.)

The plaintiffs seek actual damages for their "humiliation, rebuke, fear, pain, suffering and damage to their reputation" in an amount in excess of $1.00. (FAC at 8:25–27.) In addition, they seek punitive damages in excess of $100,000.[6] (*Id.*)

## II. DISCUSSION

### A. *Legal Standard for Summary Judgment*

Federal Rule of Civil Procedure 56(c) provides that a motion for summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

---

3. The parties dispute whether Sergeant Jacobson's threat of arrest applied only to Gibbs, or also to James and Lisenby. Although this fact is disputed, it is not material, because, for reasons discussed below, the plaintiffs have failed to raise a genuine issue of fact as to the City's liability for the ejection of any or all of the plaintiffs from the park.

4. Police departments are not suable entities under Section 1983. The proper defendant is the municipality. *See* Schwartz et al., 1B *Section 1983 Litigation* § 7.3 (1997).

5. None of the plaintiffs' pleadings identify Bruce Engel, other than to allege that he is a citizen of Oregon. (Complaint at 3:5–6.)

6. As a matter of law, municipalities are not liable for punitive damages under Section 1983. *See City of Newport v. Fact Concerts*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). A narrow exception may exist for cases where the municipality's taxpayers are responsible for the unconstitutional policy. *Id.* at 267 n. 29, 101 S.Ct. 2748. That exception does not apply here.

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Where, as here, the non-moving party has the burden of proof at trial, summary judgment is appropriate if the non-moving party fails to come forward with any evidence which would create a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The court must look to the substantive law at issue to determine which facts are "material." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding whether a dispute is "genuine," the court must determine whether a reasonable jury could return a verdict for the non-moving party. *Id.* at 248–50, 106 S.Ct. at 2510–11. It is the moving party's burden to establish that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party, however, has no burden to negate or disprove matters on which the opponent will have the burden of proof at trial. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. "Instead ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

B. *Have the plaintiffs raised a genuine issue of material fact as to the elements of a Section 1983 claim?*

■ To sustain an action against an individual officer under section 1983, a plaintiff must show (1) that the officer's conduct was committed under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right. *See Wood v. Ostrander,* 879 F.2d 583, 587 (9th Cir.1989).

1. *Were the plaintiffs' First Amendment rights violated when they were removed from the stadium?*

■ Sports stadiums, like the one at issue here, are considered public forums for the purpose of First Amendment analysis.

*See Carreras v. City of Anaheim,* 768 F.2d 1039 (9th Cir.1985); *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 569–70 (9th Cir. 1984). The government may not impose content-based restrictions on speech in public forums unless the restrictions are the least restrictive means of furthering a compelling government interest. *See Cinevision,* 745 F.2d at 571. The government may impose content-neutral restrictions on the time, place, and manner of expression provided that such restrictions are narrowly tailored to serve a significant government interest. *See Ward v. Rock Against Racism,* 491 U.S. 781, 796, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

■ These First Amendment protections apply only to speech and to expressive conduct that is considered the equivalent of speech. Where government regulates non-expressive conduct, First Amendment free speech protections do not apply. *See City of Dallas v. Stanglin,* 490 U.S. 19, 25–26, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989); *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The Supreme Court has attempted to draw a line between protected and non-protected expressive conduct, recognizing that "all conduct 'expresses' something." *See* 1 Rodney A. Smolla, *Smolla & Nimmer on Free Speech* § 11:3 (West 1997). "While freedom of speech means more than simply the right to talk and to write, it does not embrace all human activity." *Id.* (internal quotation marks omitted).

Thus, in *City of Dallas v. Stanglin,* the Court, in upholding an ordinance licensing certain private dance halls for attendance by fourteen-to-eighteen year-olds only, held that attendance at a dance hall is not expressive conduct. 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). While the Court acknowledged that association for "the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion" is protected by the First Amendment, the Court held that association for recreational dancing is not protected:

The hundreds of teenagers who congregate each night at this particular dance hall are not members of any organized association;

they are patrons of the same business establishment. Most are strangers to one another, and the dance hall admits all who are willing to pay the admission fee. There is no suggestion that these patrons "take positions on public questions" or perform any of the other similar activities described in [cases addressing expressive association].

*Stanglin,* 490 U.S. at 24–25, 109 S.Ct. 1591.

Here, the plaintiffs contend that they were engaging in both the recreational viewing of a sports event, and the expression of their views on the importance of baseball, and the virtue of their home team. (*See* James Decl. ¶¶ 3, 6–7; C. Gibbs Decl. ¶¶ 4, 7–8.)

■ In *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), which involved the conduct of sewing a peace symbol onto an American flag, the Court devised a two-part test · for determining whether conduct has risen to the level of protected expression under the First Amendment. The test asks (1) whether the actor intended to convey a particularized message; and (2) whether the conduct was likely to be understood as communication by the observers, given the surrounding circumstances. *See id.* at 410–11, 94 S.Ct. 2727.

■ Applying the *Spence* test here, the plaintiffs' free speech claim fails. The plaintiffs have not presented evidence to indicate that by attending and cheering at the game, they intended to communicate a particularized message that others at the game were likely to understand given the context of the event. The plaintiffs have not offered evidence, for example, that they attended the game to communicate a message about the dispute over ownership of the baseball franchise, or that given the context of the dispute, members of the audience would have been likely to understand such a message. Instead, the plaintiffs assert only that they intended to encourage their team to victory and communicate their support for the hometown team. (*See* James Decl. ¶¶ 3, 6–7; C. Gibbs Decl. ¶¶ 4, 7–8.)

The plaintiffs' conduct resembles the social association found non-expressive in *Stanglin* rather than the particularized communicative

conduct found in cases involving protected speech. *Compare Stanglin,* 490 U.S. at 25–26, 109 S.Ct. 1591 (holding that association as customers of the same entertainment establishment is not protected speech), *with, Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (holding that wearing black armband to school to protest Vietnam War was expressive conduct); *Aubrey v. Cincinnati,* 815 F.Supp. 1100 (S.D.Ohio 1993) (holding that unfurling religious banner in stands at World Series game constituted expressive conduct). The plaintiffs have not submitted evidence to show that they were conducting their cheering in an unusual manner so that those around them would understand that they were attempting to communicate a particularized message. *See* Peter Meijes Tiersma, *Nonverbal Communication and the Freedom of "Speech,"* 1993 Wis. L.Rev. 1525 (1993) (noting that under the *Spence* test, conduct should be analyzed to determine whether the actor expressed a communicative purpose by behaving differently than actor would have absent a communicative purpose); Note, *First Amendment Protection of Ambiguous Conduct,* 85 Colum. L.Rev. 467, 496 (1984) (same).

The evidence presented by the plaintiffs at summary judgment does not raise a genuine issue of fact as to whether they were removed from the stadium in order to stop them from engaging in speech or expressive conduct. The plaintiffs, therefore, have failed to raise a genuine issue of fact as to whether their constitutional rights were violated when they were removed from the stadium. Because the existence of a constitutional violation is an essential element of a claim under Section 1983, the defendants are entitled to judgment as a matter of law.

2. *Were the plaintiffs' Fourth Amendment rights violated when they were removed from the stadium?*

■ The plaintiffs contend that they were seized when Sergeant Jacobson escorted them from the field. The defendants do not dispute that Sergeant Jacobson informed the plaintiffs that if they did not leave, they would be arrested. (*See* James Decl. ¶ 8;

Gibbs Decl. ¶ 9; Jacobson Decl. ¶ 8.) A person is seized for Fourth Amendment purposes when, in view of all the circumstances surrounding the incident, a reasonable person would conclude that he was not free to ignore the police and go about his business. *See Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991). Here, the defendants concede that when Sergeant Jacobson informed the plaintiffs that they would be arrested if they did not leave the park, they were seized.

▆ The defendants also concede that the seizure constituted an arrest requiring probable cause, rather than a brief investigative detention requiring only reasonable suspicion. The question on this motion is therefore whether Sergeant Jacobson, at the time of the seizure, had probable cause to believe that an offense had been committed by the person to be arrested. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

The defendants contend that after the operators of the game indicated that they wanted the plaintiffs to leave, and that they had asked them to leave, Sergeant Jacobson had probable cause to believe that the plaintiffs, by not leaving, had violated California Penal Code section 602(n). This section provides that the following conduct constitutes misdemeanor trespass:

> Refusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public, upon being requested to leave by (1) a peace officer at the request of the owner, the owner's agent, or the person in lawful possession, and upon being informed by the peace officer that he or she is acting at the request of the owner, the owner's agent, or the person in lawful possession, or (2) the owner, the owner's agent, or the person in lawful possession. The owner, the owner's agent, or the person in lawful possession shall make a separate request to the peace officer on each occasion when the peace officer's assistance in dealing with a trespass is requested....

Cal.Penal Code § 602(n) (West Supp.1998).

The plaintiffs contend that Sergeant Jacobson did not have probable cause to believe that they were violating section 602(n) based on two arguments: (1) The statute only applies to areas "not open to the general public." The plaintiffs contend that Blair Field was open to the public during the game. (2) Because the plaintiffs contend they had entered Blair Field to engage in protected speech, they enjoyed a First Amendment privilege to remain on the land despite the occupier's request that they leave. *See People v. Medrano,* 78 Cal.App.3d 198, 144 Cal. Rptr. 217 (Cal.App.1978), *disapproved on other grounds, Vista Verde Farms v. Agricultural Labor Relations Bd.,* 29 Cal.3d 307, 172 Cal.Rptr. 720, 625 P.2d 263 (Cal.1981).

### a. Was Blair Field open to the public for purposes of section 602(n)?

California Penal Code section 602(n) defines refusal to leave property occupied by another as a form of trespass. The statute "envisions an originally innocent entry, followed by an unlawful sojourn after refusal of requests to leave." *Medrano,* 144 Cal.Rptr. at 227–28.

The location of Blair Field within a public park supports the plaintiffs' contention that the property was open to the public. *See Denney v. Takaoka,* 1993 WL 96602, *5, C–92–0818 FMS (N.D.Cal. Mar. 30, 1993) (holding that a university-owned land used as a park was open to the public for purposes of section 602(n)). The defendants contend, however, that Blair Field was leased to the baseball team for its exclusive use at game time, and that because the team prevented the general public from entering the field without purchasing a ticket, the field was not open to the public at the time that Sergeant Jacobson seized the plaintiffs.

▆ The Court has found no published California decision applying section 602(n) to public property that is temporarily closed to all but ticket-buying members of the public. Where, as here, no California Supreme Court case is on point, the Court should look to all available data, including intermediate appellate courts, well-reasoned decisions from other jurisdictions, and treatises. *See Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1482 (9th Cir.1986), *modified on denial of*

*rehearing,* 810 F.2d 1517 (9th Cir.1987). Here, the Court concludes that the California Supreme Court would define property "not open to the general public" to include property open only to ticket-buyers. In reviewing criminal trespass convictions for entry onto public property, courts in other jurisdictions have distinguished between areas of public facilities for which a ticket is required, and areas which anyone may enter. *See Bowman v. United States,* 212 A.2d 610, 611 (D.C.1965) (affirming conviction for unlawful entry into train station without a ticket).

Courts addressing the analogous problem of determining whether areas of a public stadium constitute public forums for free speech purposes [7] have distinguished between areas open to the non-ticket buying public and areas for which a ticket is required. *See Carreras,* 768 F.2d at 1045 n. 11; *Lewis v. Colorado Rockies Baseball Club. Ltd.,* 941 P.2d 266, 274 (Colo.1997). The California Supreme Court, in defining the state constitutional protections for speech in privately-owned shopping centers, has emphasized that the owners of such centers allow the public to enter and exit freely. *See Robins,* 153 Cal.Rptr. 854, 592 P.2d at 346.

Here, it is uncontroverted that tickets were required to enter Blair Field during the game at which the plaintiffs were seized. (*See* James Decl. ¶¶ 4:6–10, 5:17–19; Pyers Decl. ¶¶ 10, 12; Elster Decl. ¶¶ 10, 13.) The field was not open to the public without permission from the baseball team. This element of the section 602(n) violation was therefore present at the time Sergeant Jacobson made his determination of probable cause.

In addition, it is uncontroverted that plaintiff Gibbs had previously been denied entry to Blair Field by the team management. (*See* Elster Decl. ¶ 14.) In applying an Oregon statute similar to section 602(n), the Ninth Circuit held that premises are not open to the public with regard to a particular individual when that person has previously been barred from the property. *See Picray v. Sealock,* 138 F.3d 767, 772 (9th Cir.1998).

b. *Did the plaintiffs' right to enter private property to engage in protected speech vitiate Sergeant Jacobson's probable cause finding?*

■ The plaintiffs here repeat their contention that attending a baseball game to encourage their team is protected expressive conduct under the First Amendment, and that therefore section 602(n) could not be applied to remove them from Blair Field.

The plaintiffs rely on *Medrano,* where the intermediate appellate court, in reviewing a conviction under section 602(n), balanced the property rights of a farm labor camp owner against the free speech rights of union organizers to enter the property to discuss an upcoming union election with the workers who lived there.

*Medrano*'s reasoning, however, does not control this case. The court noted that it was not applying a broad constitutional standard, but rather balancing the interests based on "the idiosyncratic facts of this case." *See* 144 Cal.Rptr. at 226. In particular, the court noted that the tenants of the farm labor camp relied upon access by visitors in order to maintain their connections to the outside world. *See id.* at 226–27. A union election had been scheduled on short notice, giving organizers a brief period in which to contact the workers, and making alternative avenues of communication impractical. *See id.* Balancing these interests against the owners' property right, and considering the minimal nature of the intrusion, the court held that section 602(n) could not constitutionally be applied.

Here, however, the Court has already concluded as a matter of law that attendance at a baseball game is not, by itself, constitution-

---

**7.** It is important, however, to distinguish between the questions of whether an area is a First Amendment public forum, and whether it is open to the public for purposes of applying the trespass statute. The fact that property is open to the public may be a factor in determining that it is a public forum. *See Robins v. Pruneyard Shopping Center,* 23 Cal.3d 899, 153 Cal.Rptr. 854,

592 P.2d 341, 346 (Cal.1979). Property that is closed to the public, or for which tickets are required for entry, may still constitute a public forum for free speech purposes. *See Cinevision,* 745 F.2d at 570. The free speech cases are therefore helpful, but not controlling, in interpreting the trespass statute.

ally protected speech. Therefore, the balancing test employed in *Medrano* does not apply. Sergeant Jacobson's finding of probable cause was therefore not barred by the First Amendment.

The facts regarding the seizure are not in dispute. The plaintiffs' legal contentions that Blair Field was open to the public for purposes of section 602(n) and that section 602(n) could not be constitutionally applied because the plaintiffs were expressing support for their team are without merit. There is no genuine issue of fact as to whether Sergeant Jacobson reasonably believed that the elements of a violation of section 602(n) were present at the time of the seizure. The defendants are therefore entitled to judgment as a matter of law on the Fourth Amendment claim.

### III. CONCLUSION

The events giving rise to the plaintiffs' claims are not in dispute. The First Amendment claim fails as a matter of law, because the defendants did not remove the plaintiffs from Blair Field in order to prevent or stop speech or expressive conduct. The Fourth Amendment claim fails as a matter of law because under the totality of the circumstances reflected in the undisputed facts, Sergeant Jacobson had probable cause to believe that the plaintiffs were committing misdemeanor trespass in violation of section 602(n) of the California Penal Code.

The motion for summary judgment is therefore GRANTED.