[Civ. No. 17800. Third Dist. Nov. 17, 1978.]

PERRY FARMS, INC., et al., Petitioners, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

452

**COUNSEL**

Nomellini & Grilli, Daniel A. McDaniel, Dante John Nomellini and David L. Grilli for Petitioners.

Dressler, Stoll & Jacobs, Donald G. Dressler and Charley M. Stoll as Amici Curiae on behalf of Petitioners.

Marvin J. Brenner, Thomas M. Sobel, Ellen Lake and Gary Williams for Respondent.

Jerome Cohen, Sanford N. Nathan, Thomas M. Dalzell, Ellen Greenstone, E. Michael Heumann, Linton Joaquin, Dianna Lyons, James Rutkowski, Kirsten L. Zerger, John Rice-Trujillo and George C. Lazar for Real Party in Interest.

## OPINION

**REGAN, J.**—On June 23, 1978, we issued a writ of review, pursuant to Labor Code section 1160.8,[1] to examine petitioners' claim that respondent board exceeded its lawful authority in several material respects in "In the Matter of PERRY FARMS, INC., Respondent, and UNITED FARM WORKERS OF AMERICA, AFL-CIO, Charging Party," Case No. 76-CE-1-S, Decision and Order 4 ALRB No. 25.

The critical matters under review are the findings that petitioners Ernest Perry, Lathrop Farm Labor Center, Inc., and Perry Farms, Inc., constitute a single employer within the meaning of the Agricultural Labor Relations Act (ALRA) and that such employer was guilty of specific unfair labor practices including that of failing and refusing to bargain with a labor organization which had been validly certified as the collective bargaining agent of its employees pursuant to a proper election.[2] Petitioners also challenge (1) the board's ultimate determination that the "make whole remedy" set forth in section 1160.3 was appropriately applied herein; (2) the judicial power of the board; and (3) the application of the substantial evidence rule to judicial review of the board's decisions.

Petitioner Ernest Perry is the sole stockholder and president of Perry Farms, Inc. (PFI), a California corporation. All other corporate offices are held by Leonard Loduca. PFI has owned no land for several years and had no employees in 1975, but has leased land through 1975 which was custom farmed and harvested by petitioner Lathrop Farm Labor Center,

---

[1]All statutory references herein, unless otherwise specified, are to the Labor Code.

[2]After close of briefing, real party in interest, relying on *Merco Constr. Engineers, Inc.* v. *Municipal Court* (1978) 21 Cal.3d 724 [147 Cal.Rptr. 631, 581 P.2d 636], moved to dismiss the petition of the corporate employers on the ground that a corporate entity lacks capacity to represent itself in legal proceedings in this court. We denied the motion on the ground that *Merco* is inapplicable in these unique circumstances where, based on substantial evidence, a factual finding has been made that the petitioning parties constitute, in contemplation of law, a single legal entity. The UFW does not suggest that petitioner Perry individually lacks capacity to represent himself; and as a constituent of the integrated entity comprised of himself and the two corporate entities, Perry Farms, Inc. and Lathrop Farm Labor Center, Inc., he cannot be denied his constitutional right of access to the courts. Moreover, even if the petition had been dismissed as defectively filed by the two corporate entities (see *Paradise* v. *Nowlin* (1948) 86 Cal.App.2d 897, 898-899 [195 P.2d 867]), our decision with respect to the then remaining petition of Ernest Perry as an individual would nevertheless be as binding upon each member of the tripartite single employing entity as it is under the present circumstances.

We note that prior to oral argument counsel substituted in for all petitioners.

Inc. (LFLC). LFLC, also a California corporation, is equally owned by Ernest Perry and Leonard Loduca, Perry holding the office of president and Loduca all other offices. Loduca's only function for LFLC is the maintenance of the various farming vehicles and machinery owned by the corporation; all other corporate functions, including management and operational decisions, are performed by Ernest Perry. LFLC operates variously, at Perry's decision alone, as a farm labor contractor, a custom farmer, and custom harvester. Both corporations have the same address and telephone, share a post office box and operate out of an office a few hundred feet from Ernest Perry's home. The business phone rings both in the office and in Perry's home.

On August 30, 1975, approximately 180 LFLC employees were harvesting tomatoes on a field owned by Hatanko-Ota. The tomato crop itself was owned by Perry, either personally or as LFLC. On that morning, organizers for real party, the United Farm Workers, AFL-CIO (UFW) entered the field and began obtaining representation authorization cards from the employees. Loduca was on the land at the time and observed the peaceful solicitation of employees. At some time in the morning, Ernest Perry came to the field and attempted to stop the union solicitation. A scuffle ensued with one of the organizers and an attempt was made by Perry to destroy the authorization cards. The solicitation continued after the scuffle however, and 180 LFLC employees on the field ultimately gave the UFW organizers authorization cards which were submitted to the ALRB. These employees identified Perry as their employer. On the basis of this solicitation, a petition was filed with the ALRB requesting that an election be held of this employee unit, pursuant to section 1156.3. The petition listed the name of employer as Ernest Perry/Ernest Perry Farms, its representative as Ernest Perry and provided his phone number, which number was also the number for Perry Farms and LFLC. Similarly the address given was that used by all entities. The nature of the employer's commodity was listed as tomatoes and the bargaining unit defined as "[t]omato fields in San Joaquin County where tomatoes are grown by and/or purchased and/or harvested by the agricultural employer." The petition further recited that the bargaining unit was to include all of that employer's agricultural employees in the State of California. The petition numbered the unit as 180 and, among other things, indicated that there had been 140 employees who participated in a strike involving the stated unit in July 1974.

A copy of the petition was served upon Ernest Perry together with notice of the pertinent provisions of section 20310 of the ALRB's regulations which impose upon an employer the obligation to provide to the board or its designated agent certain information about the bargaining unit. The regulation further provides that failure "to effect timely compliance with these requirements may give rise to any or all" of certain specified presumptions regarding the unit and voter eligibility.[3] Also required to be furnished by the employer is identification of its agent within the county who is to receive subsequent communications regarding the petition.

On September 2, 1975, the same day that the petition was filed and served, the board noticed an election of the above-stated bargaining unit to be held on September 9, 1975, at St. Mary's Church in Stockton. The direction and notice of election directed the appearance of all parties at a pre-election conference one-half hour before the election.

---

[3]Emergency regulation 20310 at that time (Cal. Admin. Code, tit. 8) provided in relevant part:

"(d) Upon service of a petition, as set forth above, the employer so served shall be under an immediate obligation to provide to the Board or its designated agent the following information:

"(1) The employer's full and correct legal name, a description of the nature of its legal entity, and a full and correct address.

"(2) A complete and accurate list limited to the complete and full names and addresses of all employees in the bargaining unit sought by the petitioner appearing on the payroll applicable to the payroll period immediately preceding the filing of the petition. If the employer contends that the unit sought by the petition is inappropriate, the employer shall additionally and immediately provide the Board or its agent with a complete and accurate list of the names and addresses of the employees in the unit the employer contends to be appropriate, together with a written description of that unit. The Board will transmit a copy of such list to each of the parties upon the regional director's determination that a showing of interest has been made by the petitioner.

". . . . . . . . . . . . . . . . . . .

"(e) . . . Failure to effect timely compliance with these requirements may give rise to any or all of the following presumptions.

"(1) That there is adequate employee support for the petition;

"(2) That the petition is timely filed with respect to the employer's peak of season;

"(3) That all persons who appear to vote, who are not challenged by any other party, and who provide adequate identification (as required by [regulation] 20350), in an election pursuant to the petition are eligible voters.

"(f) In addition, the filing and service of the petition as set forth above shall require that the employer served shall immediately designate the name, address, telephone number and location of its agent within any county in which the unit sought by the petition is located for the purpose of receiving subsequent process concerning the petition.

"(g) Upon the filing and service of a petition, the Board or its agent will seek the cooperation of all parties in the dissemination to potential voters, of official Board notices of the filing of the petition and official Board notices of the direction of an election, where appropriate."

Perry's response to service of the petition was a telegram which advised the board that the proper name of the employer was Perry Farms, Inc., and that its agent was Ernest Perry. Perry's reply also stated that Perry Farms, Inc., had *no* employees on its payroll for calendar year 1975 and had not been struck within the last 36 months.

The board's regional director, Apolinar Aguilar, was unable to reach Mr. Perry to clear up the inconsistency raised by Perry's telegram and the further inconsistency of which he was aware surrounding the identity of the employer, i.e., was the employer Ernest Perry, PFI or LFLC? Although the workers solicited in the field had identified themselves as employees of Perry, they had also shown to the organizers work cards which identified them as LFLC employees.

Section 1156.3 charges the board with the duty to investigate the allegations of a petition and to determine their validity before setting up an election. While emergency regulation 20310 provides that certain presumptions regarding the nature of the bargaining unit may be applied in the event the employer fails to furnish the necessary information, the regulation does not abrogate the board's function. Here, Aguilar testified that he was unable to reach the employer who is the usual source relied upon for the necessary investigation. Aguilar spent 15 minutes consulting with UFW personnel with respect to the confusion between LFLC, PFI and Ernest Perry, and then proceeded with the election identifying the employer as PFI. Aguilar did however reschedule the preelection conference in an attempt to obtain Mr. Perry's presence and thus information from him. Aguilar's attempts to contact Perry failed, notwithstanding repeated telephone calls and finally a telegram. In any event, the election was held as scheduled despite Aguilar's failure to obtain clarification of the situation.

One hundred thirty people appeared to vote at the September 9 election, and a majority of the ballots were cast in favor of the UFW as the representative of this employee unit. The voters identified themselves as employees eligible to vote by showing to the board officials conducting the election items such as pay stubs from LFLC or from Perry personally. During the initial solicitation in the field the workers had identified themselves as employees of "Perry," despite the fact that their work cards bore the LFLC designation.

The tally of ballots setting forth the result was dated September 10, 1975, and was received by Perry on or about September 12. Perry, on September 13, filed a petition objecting to the election.

Four grounds of objection were asserted: (1) that PFI had no employees and that the board had been so notified and had further been notified that other information on the petition was incorrect; (2) that neither PFI nor its agent was given due notice of the election pursuant to section 1156.3, subdivision (a); (3) that employees of a labor contractor cannot constitutionally be attributed to the person engaging such contractor; and (4) "[t]he voters in the alleged election were willfully arranged as employees by UFW AFL-CIO for the primary purpose of voting in the election contrary to and in violation of Section 1154.6 of the Act." Service of these objections was not made upon the UFW until September 19, 1975, at the earliest.

Section 1156.3 provides that a petition objecting to an election must be filed within five days after the election. The board's emergency regulations, in section 20365, similarly provide for a five-day filing, but further require that the petition be accompanied with supporting declarations where necessary and with a declaration of service of the petition and accompanying papers upon all other parties. (Cal. Admin. Code, tit. 8, § 20365, subd. (a).) Subdivision (b) of the emergency regulation provides that where it is asserted that the geographical scope of the bargaining unit has been improperly determined or the allegations of the petition for election are incorrect, "the petition shall contain a detailed statement of the facts and law relied upon." PFI's petition was dismissed subsequently by the board on the grounds of untimeliness of service, absence of supporting declarations and the nonreviewability in such proceeding of the claimed unconstitutionality of the labor contractor attribution provision.

The dismissal of PFI's objections was ordered on September 26, 1975. On September 10, 1975, however, the board had first filed its certification of the UFW as the bargaining representative of the agricultural employees of PFI. This certification preceded expiration of the five days in which objections could be filed and in fact preceded the filing of PFI's objections. On December 19, 1975, the board filed a second order certifying the UFW as the bargaining representative of "all agricultural employees of Perry Farms, Inc., in San Joaquin County."

Subsequent requests by UFW representatives to meet and bargain with Perry were met with rejection, and on January 5, 1976, a charge of unfair labor practices was filed against PFI as employer of the worker unit solicited August 30, 1975.

The evidence submitted at the hearing, and most specifically the 1975 payroll records of LFLC, revealed that at the time the election was held, there were approximately 700 or 750 employees eligible to vote. According to UFW organizer Jim Drake's testimony there were a large number of workers in the tomato fields where the solicitations were made. Approximately an equal number of LFLC employees harvested tomatoes on fields leased by Perry Farms 30 miles away, during the relevant time period. Several hundred LFLC employees were custom harvesting cucumbers during the same time frame. The payroll records revealed that the employees often worked interchangeably in the harvesting of tomatoes, cucumbers and other crops. At the hearing, the administrative law officer (ALO) expressed his concern about the possibility that large numbers of workers were not given the opportunity to vote, and the board's counsel, expressing similar concern was granted permission to amend the complaint filed against PFI to so state. General counsel in the amended complaint asserted that under the emergency regulations, specifically section 20365, subdivision (d), PFI could not seek to set aside the election by virtue of employee nonparticipation since, it was further asserted, any such nonparticipation resulted from petitioner's failure to supply employee lists. Neither the decision of the ALO, nor the decision of the board, addressed itself to the possible disenfranchisement question. Both the ALO's decision and the board's decision held that the question of the certification could not be relitigated in the unfair labor practices hearing. As we will develop below, the disenfranchisement issue is crucial to the case and dispositive of this proceeding.

For our purposes, the issues are best divided by subject matter, as follows: (1) judicial power of the board, and the scope of judicial review of its decisions; (2) the finding that petitioners comprised a single employer, and the effect of this finding; (3) the findings of unfair labor practices; (4) the election and certification of the UFW as the bargaining representative for the employees of such single employer; and (5) the make-whole remedy.[4] By means of these major subject topics, all contentions presented by the parties can be adequately covered.

---

[4]Petitioners' challenge to the constitutionality of its exclusion of labor contractors from the Act's definition of "employers" was not relevant to the matter before the board and is

■ Our review of the entire record of this proceeding, of applicable precedents under the National Labor Relations Act (NLRA) upon which the Agricultural Labor Relations Act (ALRA) and Agricultural Labor Relations Board (ALRB) was modeled (§ 1148), together with a review of all decisions of the ALRB since its inception through hearing of this matter compels the conclusion that the board both exceeded its jurisdiction and ignored its statutory mandate to promote the rights of agricultural workers in California when it refused to consider, in the course of this unfair labor practices hearing, the validity of the election procedures resulting in the certification of the UFW as the bargaining agent for petitioners' employees. In so doing, the board ignored its own precedential rulings and those of the NLRB which provide that such issue, although generally not subject to litigation or relitigation in an unfair labor practices hearing, will be reviewed where extraordinary circumstances or newly discovered or previously unavailable evidence of a material nature is presented. It was disclosed at the hearing that approximately 75 percent of petitioners' agricultural employees may have been effectively disenfranchised in this matter as a result of both Mr. Perry's failure to comply with rules and regulations which had then been in effect less than one week, and the failure of the board's agents, specifically its regional director, to satisfactorily investigate information which put the board on inquiry as to (1) the correct identity of the agricultural employer involved, and (2) the completeness of the information before it on the nature of the bargaining unit. It is not the function of the board to impose punitive measures upon recalcitrant employers at the expense of the rights of the employees whom the ALRA was designed to protect. It appears to us that the board lost sight of this distinction in construing the disenfranchisement as a factor which petitioners might rely upon to set the certification aside, and thus of benefit to them. While petitioners may incidentally benefit from a setting aside of the certification, the harm to the possibly disenfranchised workers by the board's cavalier treatment of their rights is far greater; protection of those rights is paramount under the ALRA and is one of the primary functions of the ALRB. By focusing on Perry's conduct, as it did, the board blinded itself

---

of no relevance to the proceeding before us. It is not disputed that at the time in question LFLC was acting as a custom farmer or a custom harvester and may thus have been an agricultural employer under the definition of the ALRA. (See *In the Matter of Kotchevar Brothers*, 2 ALRB 45.) While we will not discuss this specific constitutional issue herein, we note that the exclusionary classification has been stated to reflect "a deliberate legislative choice" reasonably based on valid policy consideration. (*People* v. *Medrano* (1978) 78 Cal.App.3d 198, 207-209 [144 Cal.Rptr. 217]; see also *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16-17 [112 Cal.Rptr. 786, 520 P.2d 10].)

to the plight of any disenfranchised workers. This we find impermissible. Accordingly, we will order the board to vacate its decision, and to institute whatever proceedings are necessary to vindicate the rights of such workers.

I. *Judicial Power of the Board,*
   *and Review of its Decisions.*

We reject as meritless petitioners' contention that the judicial action of the board, or more generally the legislation authorizing judicial proceedings by the board, is unconstitutional.[5]

Under the provisions of article III, section 1, and article VI, section 1, of the California Constitution, the Legislature may not ordinarily confer judicial functions upon any statewide administrative agency which the Legislature has created. (*Laisne v. Cal. St. Bd. of Optometry* (1942) 19 Cal.2d 831, 834-835 [123 P.2d 457].) However, where the Constitution itself has authorized the creation of an agency and has *also* authorized the Legislature to vest judicial powers in that agency, the picture is different. In some instances, the Constitution has explicitly authorized assertion of judicial power by an administrative agency it created, such as the Department of Alcoholic Beverage Control (art. XX, § 22), or the Public Utilities Commission (art. XII, § 6). But this need not be the only way such powers are granted by the Constitution. For example, the Constitution can set up an administrative program such as the system of workers' compensation it created in article XIV, section 4, and expressly leave it to the Legislature to create the administrative agency, or board, with judicial powers, to effectuate the system. (See *Marcus v. Workmen's Comp. Appeals Bd.* (1973) 35 Cal.App.3d 598, 602 [111 Cal.Rptr. 101]; see also, Kleps, *Certiorarified Mandamus: Court Review of California Administrative Decisions 1939-1949.* (1949-1950) 2 Stan.L.Rev. 285, 293.)

Article XIV, section 1, with which we are here dealing, is a provision of the latter sort described above.[6] Its provisions are clear and

---

[5] It is clear that the board is authorized by statute to exercise functions of a judicial nature, in that it determines controverted facts between private litigants, makes findings and issues a remedial order or decision. In short, it adjudicates labor disputes on a statewise basis. (§§ 1160.2-1160.9.)

[6] Article XIV, section 1, reads in its entirety as follows: "The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive, and judicial powers."

unambiguous. It is true that the history of the measure shows it to have derived from an original provision to give authority to the Legislature to provide for a minimum wage for women and minors and for the comfort, health, safety and general welfare of any and all employees. The Legislature was authorized to confer on any commission it might create the powers required to carry out the provisions of the section. (See art. XX, § 17½, as adopted Nov. 3, 1914. This measure was amended Nov. 3, 1970, and slightly reworded in a manner not here pertinent. Finally, on June 8, 1976, the provision was repealed, reenacted and renumbered.)

We reject the restrictive construction placed upon the provision by petitioners which would limit the Legislature only to the specific subjects of wages, hours and working conditions. A far more rational approach is to look to the plain language of the section as it has evolved. (See *Western Metal Supply Co.* v. *Pillsbury* (1916) 172 Cal. 407, 420 [156 P. 491] (conc. opn. of Angellotti, C. J.; *Pacific Telephone etc. Co.* v. *Eshleman* (1913) 166 Cal. 640, 657 [137 P. 1119].) In 1914 it authorized the Legislature "to confer upon any commission now or hereafter created, such power and authority as the Legislature may deem requisite to carry out the provision of this section." It is probably true that in the historical context of the milieu of 1914, minimum wages for women and children and a concern for health and safety of workers were of paramount consideration to the voters. However, as time progressed, and as the provision in question was reenacted and amended, the historical context involving labor relations was in the process of evolution, as is common knowledge. The words "general welfare of employees" have been in the section from the original enactment to the present.

It is clear that the reference to general welfare of employees in conjunction with the grant of authority to enact laws pertaining to a "minimum wage" and for the "comfort, health, safety" of employees serves to permit the Legislature to enact laws to promote the general welfare of employees; the section cannot be restricted to wages, hours and conditions of work to the exclusion of such employee rights as self-representation and collective bargaining. No one questions that improvement of wages, hours and conditions of work is a goal of any collective bargaining system.

■ ". . . '. .. . A constitution is intended to meet and be applied to any conditions and circumstances as they arise in the course of the

progress of the community. The terms and provisions of constitutions are constantly expanded and enlarged by construction to meet the advancing affairs of men. While the powers granted thereby do not change, they do apply in different periods to all things to which they are in their nature applicable. . . :' " (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 635 [268 P.2d 723]; see also *Los Angeles Met. Transit Authority* v. *Public Util. Com.* (1963) 59 Cal.2d 863, 869 [31 Cal.Rptr. 463, 382 P.2d 583].)

■ Moreover, a strong presumption favors the Legislature's interpretation of a constitutional provision (*San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26]); all intendments are to be resolved in support of that exercise (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161]).

Article XIV, section 1, and its predecessors themselves created no implementing agency or agencies; that was left to the Legislature. In this connection, the Legislature early created the Industrial Accident Commission (now Division of Industrial Accidents, including the Worker's Compensation Appeals Board) which has consistently had its judicial functions upheld by the courts. (See, e.g., *Pacific G. & E. Co.* v. *Industrial Acc. Com.* (1919) 180 Cal. 497, 500-501 [181 P. 788]; *Solari* v. *Atlas-Universal Service, Inc.* (1963) 215 Cal.App.2d 587, 593 [30 Cal.Rptr. 407]; Lab. Code, §§ 50, 50.5, 111.) In our opinion it follows the Legislature is empowered by article XIV, section 1, of the Constitution to create and repose judicial functions in the Agricultural Labor Relations Board in the manner in which it has done.

The scope of judicial review applicable to decisions of the board is defined in section 1160.8, which, after vesting review jurisdiction directly in the Courts of Appeal, provides in part that "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive."

It is not disputed that the California Agricultural Labor Relations Act was modeled upon the National Labor Relations Act. The above-quoted standard is *identical* with that appearing in the federal act. (See Lab. Code, § 1160.8; 29 U.S.C.A. § 160(f).) The substantial evidence test described in both statutes is also notably similar to the test applied in administrative review proceedings under Code of Civil Procedure section 1094.5.

In 1951, the United States Supreme Court discussed the federal statutory standard as follows: "To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority or an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting the decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467-468, 71 S.Ct. 456].)

It is thus well settled that where a decision of the National Labor Relations Board is supported by substantial evidence, that decision will not be overturned by an appellate court, even though the situation may have been susceptible to contrary views and appraisals. (See, e.g., *National Labor Relations Board* v. *Giallanza* (2d Cir. 1953) 208 F.2d 243, 244; *National Labor Relations Board* v. *Nelson* (3d Cir. 1953) 208 F.2d 230, 231; *National Labor Relations Bd.* v. *Howell Chevrolet Co.* (9th Cir. 1953) 204 F.2d 79, 85, affd. *Howell Chev. Co.* v. *Labor Board* (1953) 346 U.S. 482 [98 L.Ed. 215, 74 S.Ct. 214]; *N.L.R.B.* v. *Byrds Manufacturing Corporation* (8th Cir. 1963) 324 F.2d 329, 332-333.)

The scope of review described in *Universal Camera, supra,* has been held to equate fully with the California substantial evidence rule. (*Martin* v. *Alcoholic Bev. etc. Appeals Bd.* (1959) 52 Cal.2d 238, 246 [340 P.2d 1]; *Coomes* v. *State Personnel Board* (1963) 215 Cal.App.2d 770, 773 [30 Cal.Rptr. 639].) Thus the rule in federal courts, with regard to review of the national board's credibility determination, and our rule with regard to review of credibility determinations of an administrative agency, are the same.[7] Such determinations are peculiarly within the province of the trier

---

[7]See, e.g., *American Federation of Teachers* v. *San Lorenzo etc. Sch. Dist.* (1969) 276 Cal.App.2d 132, 135 [80 Cal.Rptr. 758] (substantiality of the evidence is determined by isolating and considering only the evidence supporting the administrative decision and

of fact and are not to be disturbed absent a demonstration that the credited testimony is incredible on its face, or is inherently improbable. (See *Labor Board* v. *Pittsburgh S. S. Co.* (1949) 337 U.S. 656, 660 [93 L.Ed. 1602, 1606, 69 S.Ct. 1283]; *Kircher* v. *Atchison, T. & S. F. Ry. Co.* (1948) 32 Cal.2d 176, 183 [195 P.2d 427]; *Kendall* v. *Bd. of Osteopathic Examiners* (1951) 105 Cal.App.2d 239, 245 [233 P.2d 107].)

■ Also appropriately considered under this heading is petitioners' claim that they were entitled to a jury trial because the proceeding before the board constituted a trial on issues of fact which resulted in a recovery in a form analogous to money damages. Petitioners rely on article I, section 7, of the California Constitution and Code of Civil Procedure section 592.[8] The California Supreme Court, in rejecting an employer's claim that it was entitled to a jury trial in proceedings before the Industrial Accident Commission, pointed out that notwithstanding the constitutional provision for jury trial "the legislature is . . . expressly authorized by section 21 of article XX, to provide for the settlement by arbitration, by a board, or by the courts, of disputes involving the liability of employers. This section, adopted in 1911, worked a repeal *pro tanto,* of any conflicting provision which may have been in force theretofore." (*Western Indemnity Co.* v. *Pillsbury* (1915) 170 Cal. 686, 695 [151 P. 398].) The rationale just quoted, is equally applicable to a similar claim asserted with respect to proceedings before the board, since a similar constitutional grant of authority exists with respect to the ALRA, specifically, article XIV, section 1. (See discussion above.)

Moreover, proceedings before the board are neither civil actions nor proceedings known to the common law and absent a statute providing for a jury trial in such proceedings, no such right exists. (*McComb* v.

not that conflicting with it); *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court* (1968) 259 Cal.App.2d 306, 318 [66 Cal.Rptr. 183] (court must consider the evidence in the light most favorable to the respondent, must give it the benefit of every reasonable inference, and must resolve all conflicts of evidence in support of the administrative decision); *Mattison* v. *City of Signal Hill* (1966) 241 Cal.App.2d 576, 583 [50 Cal.Rptr. 682] (court must resolve all doubts as to sufficiency of the evidence in favor of the findings and decisions of the administrative agency); *Rapp* v. *Napa County Planning Com.* (1962) 204 Cal.App.2d 695, 698 [22 Cal.Rptr. 643] (court must disregard evidence contrary to that in support of the body's findings); *Marcucci* v. *Board of Equalization* (1956) 138 Cal.App.2d 605, 608 [292 P.2d 264] (all reasonable inferences must be indulged in support of the administrative decisions).

[8]Article I, section 7, declares generally the right to jury trial and Code of Civil Procedure section 592 specifically provides that where a claim for money damages is made, issues of fact must be tried by a jury.

*Commission on Judicial Performance* (1977) 19 Cal.3d Spec. Trib. Supp. 1, 10 [138 Cal.Rptr. 459, 564 P.2d 1]; *People* v. *One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 286-287 [231 P.2d 832].)

The United States Supreme Court, in *Labor Board* v. *Jones & Laughlin* (1937) 301 U.S. 1, 48-49 [81 L.Ed. 893, 917-918, 57 S.Ct. 615], emphatically rejected an employer's claim that it had a right to a jury trial in proceedings under the NLRA which resulted in an order directing the payment of money. The court there noted that the Seventh Amendment of the United States Constitution preserves the right to jury trial which existed under common law at the time the amendment was adopted, and since the case before it was neither an action at common law nor in the nature of one but was instead a statutory proceeding unknown to the common law, it was thus one for which no right of jury trial existed. Petitioners' claim that they are entitled to a jury trial must be rejected.

## II. *Did Petitioners Comprise a Single Employer?*

█ The board's finding that Perry, PFI and LFLC are a single integrated enterprise comprising one employer for purposes of the act is supported by substantial evidence. Under NLRB precedent the board acquired jurisdiction over all petitioners as one single employer notwithstanding its failure specifically to serve upon each a copy of the unfair labor charge and the concurrent failure to list each as a respondent in the complaint.

On the subject of petitioners' unitary nature, the board expressly found that "Ernest Perry owns all stock in, and is President of Perry Farms, Inc. Leonardo Loduca is its Vice-President. Perry and Loduca each own 50% of the stock of LFLC. Again, Perry is the President and Loduca the Vice-President. Both LFLC and Perry Farms, Inc., share the same address and same telephone number. Ernest Perry makes all of the material decisions for both entities. He controls and administers, and makes the labor relations decisions and policy for both. Perry also establishes and negotiates the deals in which the two corporate entities participate. The record discloses that one or the other of these entities variously functioned under Perry's personal direction during 1975 as an owner of growing crops, as a labor contractor, and as a custom farmer and harvester, and that it was Perry who determined in which capacity they functioned." (*Perry Farms, Inc.,* 4 ALRB No. 25, pp. 4-5.)

Under applicable NLRB precedent, these facts support the conclusion that petitioners constitute one employer within the meaning of the act (see, e.g., *Houston Distribution Services, Inc.* (1977) 227 NLRB 960, 961, enforced, 573 F.2d 260 (5th Cir. 1978); *Marsal Transport, Inc.* (1972) 199 NLRB 689, 698; *P-M Parking System* (1962) 139 NLRB 987, 993). Similarly, under applicable NLRB precedent, an uncharged and unnamed party may be held responsible for unfair labor practices where that unnamed entity comprises part of a single employer which was properly served and named. (See *Esgro, Inc. and Esgro Valley, Inc.* (1962) 135 NLRB 285, 286; and see *Bagel Bakers Council of New York* (1976) 226 NLRB 622, enforced, 555 F.2d 304 (2d Cir. 1977).)

Petitioners do not seriously contest the substantiality of the evidence supporting the board's determination of a single employing entity and thus of jurisdiction over them herein, but do contend that to hold each entity charged with and responsible for the conduct in question "puts the cart before the horse." Petitioners argue that the board's decision imputes to them, in a nunc pro tunc manner, knowledge of a rule which the board itself did not declare until over a year and a half after the ALRA became law. In *Kotchevar Brothers,* 2 ALRB 45, decided March 2, 1976, it was held for the first time that a labor contractor could be an agricultural employer, within the meaning of the act, when his employees were engaged in custom farming or custom harvesting. It is submitted by petitioners that under the clear language of the ALRA itself (§ 1140.4, subd. (c)) a labor contractor could not be an agricultural employer. In *People* v. *Medrano, supra,* 78 Cal.App.3d 198, 208-209, this court held that a labor contractor could not be guilty of an unfair labor practice under the act.

Based on the confusion surrounding the status of a labor contractor at the time the questioned conduct occurred, petitioners argue that NLRB precedent may not be applied to support a holding that LFLC had an obligation to bargain with the UFW on the basis of the certification of the UFW as the bargaining representative for PFI, and further, that LFLC could not be charged with the failure so to bargain until such time as the finding of an integrated employer was made.

Since we will hold herein that the election and certification were improperly denied review, we need not determine whether, under the facts of this case and the legal circumstances as they existed in September 1975, it was inappropriate for the board to apply NLRB precedent. The

ALRA makes it quite clear that only applicable NLRB precedent is to be followed. (§ 1148.) In our opinion we are inclined to agree with petitioners and to hold the cited precedents inapplicable to these unique circumstances.

III. *The Findings of Unfair Labor Practices.*

Petitioners were held by the board to have been guilty in two instances of unfair labor practices as defined by section 1153, subdivision (a). The first involved the violent interference by Perry with the August 30 organizing activities of Jim Drake and others in fields where the crop owned by Perry or LFLC was being harvested. As noted previously, the organizing was proceeding in a peaceful manner when Perry attacked Jim Drake and knocked him down. Either Perry or Loduca assaulted Drake further by pulling out a portion of his mustache. Drake's car was entered by Perry who removed authorization cards which he attempted to destroy. Thereafter Perry armed himself with an ax handle with which he threatened Drake.

Petitioners seek to justify this violent activity by insisting that the organizers were trespassers upon the property. The organizers' status, whether trespassers or lawful visitors, is of no consequence since it is well settled under NLRB precedent (see § 1148) that notwithstanding a union representative's technical trespass upon an employer's property, violent attacks upon him in the presence of the workers sought to be organized constitutes an unfair labor practice. (See, e.g., *Sullivan Surplus Sales, Inc.* (1965) 152 NLRB 132, 149; *N.L.R.B.* v. *Gibbs Corporation* (5th Cir. 1962) 297 F.2d 649, 651; *N.L.R.B.* v. *McBride* (10th Cir. 1960) 274 F.2d 124, 126-127.) In a slightly different context, the same rule has been held applicable in California. (See *Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters* (1976) 17 Cal.3d 893, 898-907 [132 Cal.Rptr. 443, 553 P.2d 603]; see also *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 420-421 [128 Cal.Rptr. 183, 546 P.2d 687].)

Moreover, the conduct of the organizers was not directed at damaging the property which Perry claims he was protecting, nor were Perry's actions reasonably related to the protection of property. It is clear from the record that Perry's sole aim was to stop the organization of his workers.

■ Petitioners also challenge the finding relating to the August 30, 1975, conduct on the basis of section 1160.2 which states, in pertinent part, that "[n]o complaint shall issue based upon an unfair labor practice occurring more than six months prior to the filing of the charge with the board and the service of a copy thereof upon the person against whom such charge is made . . . ." The charge in the instant matter was made on January 5, 1976, and made no mention whatever of any August 30, 1975, incident. Nor did the formal complaint, served upon Perry February 6, 1976, make mention of the August incident. Both documents relate solely to petitioners' refusal to bargain with the UFW. Not even at the hearing did any intention by the board to rely on the incident become apparent.[9] An amended complaint, filed upon conclusion of the hearing, also fails to include any reference to the August 30 incident.

The posthearing brief, filed by the board, for the first time referred to the August 30 conduct as indicative of Perry's bad feelings toward unionization of his employees. Even this brief, however, does not suggest that a finding of an unfair labor practice be made on the basis of this conduct. The first indication that the August 30 conduct was of more than historical interest was the decision of the ALO in which he held that such conduct constituted an unfair labor practice. The ALO, in listing the incidents to be considered as possible unfair labor practices characterized such incidents as "alleged and/or litigated." The board, in its subsequent decision, reiterated the finding that petitioners were guilty of an unfair labor practice arising out of the August 30 incident.

Upon review, the board and the UFW defend the insertion of the August incident by arguing that the six-month limitation of section 1160.8 is not a jurisdictional time limit, but an affirmative defense which is waived if not asserted, and further argue that not only did petitioners fail to assert the defense at the first practicable time, but further, that they lost

---

[9]On the third day of the hearing, UFW organizer Jim Drake was called by the board as a witness. Drake testified to the events of August 30, and revealed the disruption in the organizing process caused by Perry. Drake was cross-examined by Perry with respect to the former's knowledge of the effective date of the access rule, questions which were aimed at showing that Drake's presence on the property constituted a trespass, not at refuting the testimony of the events. Perry was called by the board as an adverse witness that same day but was not asked by the board's counsel or by the UFW counsel anything about the August 30 incident except whether or not he was aware that organizers had been soliciting union representation cards from his workers. On cross-examination, Perry's only reference to the incident was to the effective date of the access rule. Perry's attempt to contradict Drake's testimony was through his witness Loduca who stated that he, not Perry, pulled Drake's mustache.

the right to assert the defense by litigating the issue on its merits, i.e., presentation of evidence on the issue.

In the cases relied upon to support the theory of waiver of the defense, *Chicago Roll Forming Corp.* (1967) 167 NLRB 961, 971, and *Shumate* v. *N.L.R.B.* (4th Cir. 1971) 452 F.2d 717, 720-721, there was no question but what a specific charge or complaint had been made with reference to the conduct occurring outside the six-month time limitation of the equivalent section under the NLRA, section 10, subdivision (b), as amended 29 United States Code Annotated section 160(b). Moreover, the conduct in those cases was accompanied by either continuing or similar conduct occurring within the six-month period, thus creating a single issue of essentially continuous conduct, portions of which actually occurred during the permissible period. Here, to the contrary, the only possible other similar act of unlawful interference with representational activities, apart from the total refusal to bargain, was Ernest Perry's conduct in response to an attempt by two board agents to serve a subpoena on him in December 1976. Evidence of this incident was related at the hearing, but the ALO found that conduct not to constitute an unlawful interference and thus not an unfair labor practice under section 1153, subdivision (a). The board, in its decision, did not mention the second incident.

It is undisputed that petitioners had no notice that the August incident was to be charged against them as an unfair labor practice. Contrary to the position of the board and the UFW, petitioners' presentation on the subject can be viewed as one designed to develop a complete historical picture surrounding the refusal-to-bargain charge, not as the introduction of a defense to an unfair labor practice charge based on the August events. Accordingly, petitioners may not be said to have waived their right to assert the limitations provision of section 1160.8 by litigating the merits of the case. (Cf. *Shumate* v. *N.L.R.B., supra,* 452 F.2d at pp. 720-721.) Petitioner asserted this defense at the first practicable time in its exceptions to decision of the ALO. The board's finding that the August conduct comprised an unfair labor practice was therefore improperly made. (See *Pleasant Valley Vegetable Co-Op.,* 4 ALRB No. 11, p. 5.)

The second unfair labor practice, that of refusal to bargain necessarily presumes the validity of the election and certification of the UFW as the representative of petitioners' employees. Since we will not uphold that election and certification, the second unfair labor practice finding must also fall.

IV. *Election and Certification Board's Refusal to Review.*

█ Under the ALRA, and applicable California law, an order certifying a bargaining representative is not a final order of the ALRB which may be judicially reviewed. (*Nishikawa Farms, Inc.* v. *Mahony* (1977) 66 Cal.App.3d 781, 787 [136 Cal.Rptr. 233].) Accordingly, the only way an employer may obtain judicial review of an election and certification is to (1) refuse to bargain with the representative whose certification it challenges; (2) be found guilty by the board of an unfair labor practice because of such refusal to bargain, and (3) obtain review of the election and certification in the course of judicial review on the unfair labor practice decision. (*Ibid.*) Petitioners herein refused to bargain with the UFW. Consequently an unfair labor practices charge was filed against PFI asserting such refusal to bargain.

█ It became clear at the hearing on the refusal-to-bargain charge that the employees who had been solicited on August 30, and who voted on September 9, were employees of LFLC, a licensed farm labor contractor, not employees of PFI, or of Ernest Perry personally. At the request of the board's counsel and of the UFW, an additional issue was added to the case, specifically, whether LFLC, PFI and Ernest Perry constituted a single employer. Based almost wholly on the testimony of Ernest Perry, the determination was made that a single employing entity existed and an amended complaint so stating was permitted to be filed. However, it also became clear at the hearing that LFLC employed far more than the 150 to 180 persons solicited on August 30. In evidence were LFLC's payroll records for the period in question and these records revealed that LFLC may have had 700 to 750 employees who were eligible to vote in the election which was held. It was Perry's position that early in September 1975 the law expressly excluded farm labor contractors from its definition of agricultural employers. (§ 1140.4, subd. (c).) It was also clear that under the ALRA the definition of an agricultural employer was to be broadly construed.

It appears from the testimony of Perry that in August and early September 1975 he had approximately 400 to 500 workers custom harvesting tomatoes and an additional several hundred workers custom harvesting cucumbers. The exact nature and location of those LFLC workers harvesting cucumbers is not clear from the record, but it does appear that they were engaged in custom harvesting at that time. Under

the definition in effect in September 1975,[10] a copy of which was furnished to Perry, it would seem that the tomato harvesters working the Hatanka-Ota field would be attributable to LFLC or Perry (the owner of the crop) as an agricultural employer, and those tomato harvesters working on the PFI property attributable to PFI as the person who had engaged the labor contractor (LFLC) which employed them. The LFLC workers harvesting cucumbers would, pursuant to the last sentence of the broad definition, be attributable as agricultural employees to whomever had engaged LFLC's services.

In the case of *Kotchevar Brothers, supra,* the board held that when a labor contractor uses his employees in custom farming or custom harvesting, he is to be deemed their agricultural employer for purposes of the act.[11] The *Kotchevar* rule represents, to our view, a strained construction of the ALRA's broad definition of an agricultural employer, and one certainly not reasonably apparent in the early days of the ALRA. It is this construction, however, which the board has utilized in this case and under which we continue our analysis.

At the unfair labor practice hearing, Perry pointed out the board's failure to investigate the identity of the agricultural employer before proceeding with the election. The board's hearing officer was severely troubled by the lack of investigation and more significantly by the fact that a large portion of the LFLC employees may thus have been disenabled from voting. Counsel for the board in fact received permission to amend the complaint in the matter to reflect lack of notice to many LFLC employees. Counsel for the board, counsel for the UFW, and the ALO in his decision all took the position that the propriety of the certification was not affected by this factor. The board's counsel argued that under emergency regulation section 20365, subdivision (d) "[n]o

---

[10]"(c) The term 'agricultural employer' shall be liberally construed to include any person acting directly or indirectly in the interest of an employer in relation to an agricultural employee, any individual grower, corporate grower, cooperative grower, harvesting association, hiring association, land management group, any association of persons or cooperatives engaged in agriculture, and shall include any person who owns or leases or manages land used for agricultural purposes, but shall exclude any person supplying agricultural workers to an employer, any farm labor contractor as defined by Section 1682, and any person functioning in the capacity of a labor contractor. The employer engaging such labor contractor or person shall be deemed the employer for all purposes under this part." (§ 1140.4, subd. (c).)

[11]We find it noteworthy that this definition was developed in a case where, had the farm labor contractor's employees been attributed to the grower who had engaged the contractor's services, an election certifying the UFW as bargaining representative of that grower's agricultural workers would have to have been set aside.

party may allege as grounds for setting aside an election its own conduct or the conduct of its agents." The use of this ground is premised, of course, upon the position that petitioners would benefit from the setting aside of the election and that since petitioners' conduct contributed to the confusion, they were entitled to no relief.

The ALO, in refusing to consider questions of the propriety of the election, simply stated that "[e]lection issues shall not be litigated in an unfair labor practice proceeding absent a Board order combining such issues with unfair labor practices for hearing. Moreover, a certification is not attackable in [an unfair labor practice] proceeding except upon constitutional grounds going to a party's opportunities to utilize Board processes in the election procedure. In this case the employer had timely notice of the petition and timely notice of the election. (Notice of election is timely if the party has an opportunity to timely file objections to the election.) [¶] Therefore the certification is inviolate in these proceedings. [¶] In this connection, the General Counsel's and Intervenor's motion to amend the certification [to add LFLC as an employer] is denied."

In a footnote to the above-quoted statement, the ALO did acknowledge the possible disenfranchisement issue, stating "There was some suggestion that eligible voters in numbers sufficient to affect the results of the election were not given notice of the election and were therefore denied the opportunity to vote. I believe this is a similar due process issue to lack of notice to any other party. I also believe the issue to be very different from issues concerning sick voters, 50% employment requirements, and many other issues which have in common only the conclusion that a potential voter did not vote. However, no one proved or attempted to prove that sufficient eligible voters to affect the results of the election were denied that opportunity. References to the gross number of employees of an employer by year, month, or even by week is not sufficient. As the employer engaged in both farming and labor contracting, there must be proof that the employees who did not vote were eligible to vote. The burden of overcoming the policy of enforcing certifications is with the party attacking the certification."

The board, in its ultimate decision, also refused to consider possible improprieties in the election and certification, dealing with the issue as follows:

"In its answer to the complaint, Respondent raised *inter alia,* the defense that there was no proper election conducted among its employees, that the certification was invalid, and that it was therefore under no duty to bargain with the Union. Although the ALO received a substantial amount of testimony with respect to representation issues, he concluded that the certification was not subject to attack in this unfair labor practice proceedings. While we agree with the ALO's conclusion, we wish to clarify its rationale.

"Under NLRB precedent, in the absence of newly discovered or previously unavailable evidence or extraordinary circumstances, a respondent in a refusal to bargain proceeding may not litigate matters which were or could have been raised in the prior representation proceedings. See, e.g., *King's Markets, Inc.,* 233 NLRB No. 60 (1977). This broad proscription against relitigation of representation issues in related unfair labor practice proceedings has been consistently supported by the courts since the earliest days of the NLRA. See *Pittsburgh Plate Glass Co.* v. *NLRB,* 313 U.S. 146, 162, 8 LRRM 425 (1941). We view this doctrine as also appropriate to proceedings under the ALRA. It expresses a proper balance between the statutory goals of achieving finality and stability in representation matters and the interest of the Board and the parties in assuring that there has been a full and fair opportunity for investigation of facts bearing on the propriety of the election and certification process. We shall hereafter apply it in our cases."

What all parties, except petitioners, have failed to note in their pleadings and decisions herein, and in the briefs and other documents filed with this court, is the effect that their position had on the approximately 600 employees of LFLC who were totally ignored in the organizational and election process. The stated policy underlying ALRA is "to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing, to negotiate the terms and conditions of their employment, and to be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." (§ 1140.2.) The board, in its conduct of these proceedings from their inception, has blatantly ignored this policy. While we do not condone, by any means, the conduct of Mr. Perry, we, like the board, are obligated to see that the mandate of the Legislature is carried out.

NLRB precedent, which the board contends compelled its refusal of consideration of the certification issue, only compels such refusal "in the absence of newly discovered or previously unavailable evidence or extraordinary circumstances . . . ." This language is taken from the above-quoted portion of the board's decision. It is inconceivable that the board rejected the situation before it as one within the stated exception. Throughout the board's history, its opinions have repeated the paramount nature of its obligation to protect the rights of agricultural workers to organize and bargain. To ignore the disenfranchisement which may have occurred in this case in order to proceed with the imposition of sanctions upon an employer is unconscionable. Accordingly, we will order the board's decision vacated and direct the board to take all necessary proceedings appropriate to implementation of the public policy underlying enactment of the ALRA.

V. *Application of "Make-Whole" Remedy.*

As a remedy for petitioners' refusal to bargain with the UFW, the board imposed the requirement that petitioners' employees be compensated for the economic losses suffered as a consequence of that refusal. Since we have held that the board improperly refused to consider the election and certification issues as a part of this proceeding, resulting in the effective disenfranchisement of perhaps 75 percent of petitioners' employees, and that appropriate steps must be taken to remedy that error, it is clear that the make-whole penalty cannot presently stand. If, after proper election and certification procedures occur petitioners again refuse to bargain with the bargaining representative so certified, and the board deems it an appropriate case for application of the make-whole remedy, the issue will be considered upon judicial review of any final order then made. In this proceeding, however, we state no opinion with respect to the make-whole remedy, specifically or in general.

The order of the board under review is set aside in its entirety and the board is directed to take all appropriate proceedings consistent with the views expressed herein.

Puglia, P. J., and Carr, J.,* concurred.

Petitions for a rehearing were denied December 13, 1978, and the petitions of the real party in interest and petitioners for a hearing by the Supreme Court were denied January 24, 1979. Bird, C.J., did not participate therein. Tobriner, J., was of the opinion that the petitions should be granted.

*Assigned by the Chairperson of the Judicial Council.*